## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**BRISTOL MYERS SQUIBB COMPANY,**                                          **PLAINTIFF**

**v.**                              **CASE NO. 4:26-CV-00618-LPR**

**DEBBIE MACK, RODNEY RICHMOND, LENORA
NEWSOME, CLINT BOONE, LYN FRUCHEY,
BRIAN JOLLY, HAROLD H. SIMPSON, and BETH
ANN DAVENPORT, in their official capacities as
members of the Arkansas State Board of Pharmacy,**                **DEFENDANTS**

### BRIEF IN SUPPORT OF DEFENDANTS' COMBINED
### MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Table of Contents...........................................................................................................................1

Table of Authorities .....................................................................................................................2

Introduction ..................................................................................................................................6

Background ....................................................................................................................................8

    A.  Act 630's enactment and the *Novartis* litigation supplied a
        lengthy and public procedural backdrop ..........................................................9

    B.  BMS waited until after this Court's *Novartis* ruling—and more
        than a year after Act 630's passage—to seek preliminary relief.....................9

    C.  The Board unanimously adopted a categorical non-enforcement
        resolution, unanimously authorized a settlement framework for
        Act 630 litigation, and removed pending Act 630 applications
        from its agenda .....................................................................................................10

Legal Standards..........................................................................................................................12

Argument .....................................................................................................................................14

   I.    The Court should dismiss the case and deny the preliminary-injunction
       motion because there is no imminent threat of enforcement .............................15

   II    BMS cannot establish irreparable harm because its own delay belies the
       asserted urgency, and, in any event, the Board's formal actions eliminate
       the threatened enforcement on which BMS's alleged injuries depend............19

      A.  BMS's substantial delay defeats its claim of irreparable harm....................20

      B.  There's no threat of imminent, irreparable harm .......................................23

   III.  The merged balance-of-the-equities and public-interest factors weigh
       decisively against preliminary injunctive relief ..................................................26

Conclusion ...................................................................................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Abbott v. Perez*,
    585 U.S. 579 (2018)................................................................................................14

*Adventist Health Sys./SunBelt, Inc. v. HHS*,
    17 F.4th 793 (8th Cir. 2021) .............................................................................20-23, 25

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013)................................................................................................16

*Auer v. Trans Union, LLC*,
    902 F.3d 873 (8th Cir. 2018) ..............................................................................18, 20

*Beaulieu v. Ludeman*,
    690 F.3d 1017 (8th Cir. 2012) ........................................................... 13, 16-17, 19

*Benisek v. Lamone*,
    585 U.S. 155 (2018) (per curiam) ........................................................................ 20

*Carlsen v. GameStop, Inc.*,
    833 F.3d 903 (8th Cir. 2016) ..............................................................................12

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*,
    640 F.2d 109 (8th Cir. 1981) (en banc) .................................................................13

*DHS v. New York*,
    589 U.S. 1173 (2020)........................................................................................21, 26

*Eggers v. Evnen*,
    48 F.4th 561 (8th Cir. 2022) ........................................................................ 13, 14

*Harris v. P.A.M. Transp., Inc.*,
    339 F.3d 635 (8th Cir. 2003) ..............................................................................12

*Heartland Acad. Cmty. Church v. Waddle*,
    427 F.3d 525 (8th Cir. 2005)................................................................................19

*Just. Network Inc. v. Craighead County*,
    931 F.3d 753 (8th Cir. 2019)...............................................................................190

*Kohls v. Ellison*,
    166 F.4th 728 (8th Cir. 2026) ............................................................................20-21, 23

*LaBatte v. Gangle*,
  161 F.4th 1109 (8th Cir. 2025) ................................................................. 16-17

*Malinowski v. United States*,
  2026 WL 1750072 (E.D. Ark. June 17, 2026) ...............................................12

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)............................................... 6-7, 20, 23, 25, 27

*Minn. Chapter of Assoc. Builders & Contractors v. Ellison*,
  153 F.4th 695 (8th Cir. 2025)...............................................................18-19

*Minn. Chapter of Assoc. Builders & Contractors v. Ellison*,
  146 S. Ct. 1603 (2026)........................................................................18-19

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)..........................................................................18

*Moss v. United States*,
  895 F.3d 1091 (8th Cir. 2018)............................................................ 12, 15

*MPAY Inc. v. Erie Custom Comp. Apps., Inc.*,
  970 F.3d 1010 (8th Cir. 2020)................................................................13

*Ng v. Bd. of Regents of Univ. of Minn.*,
  64 F.4th 992 (8th Cir. 2023) ................................................................ 20

*Novartis Pharmaceuticals Corp. v. Griffin*,
  2026 WL 1382468 (E.D. Ark. May 17, 2026) ................................... 6-11, 21-23, 26

*Osborn v. United States*,
  918 F.2d 724 (8th Cir. 1990) ................................................................12

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ..........................................................................17

*Roth et al. v. Jones, et al.*,
  No. 4:25-cv-00733-LPR .......................................................7, 20, 22, 26

*Roubideaux v. N.D. Dep't of Corr. & Rehab.*,
  570 F.3d 966 (8th Cir. 2009)................................................................13

*Smith v. Reynolds*,
  139 F.4th 631 (8th Cir. 2025) ..............................................................19

*In re Smith*,
  921 F.2d 136 (8th Cir. 1990)................................................................12

*Tumey v. Mycroft AI, Inc.*,
  27 F.4th 657 (8th Cir. 2022) .......................................................................13, 22-25

*W. Virginia v. EPA*,
  597 U.S. 697 (2022) ..................................................................................................17

*Whitfield v. Thurston*,
  3 F.4th 1045 (8th Cir. 2021) ........................................................................... 12, 16

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021)....................................................................................................18

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ............................................................................................. 13, 23

*Ex parte Young*,
  209 U.S. 123 (1908)....................................................................................8, 15, 18-19

*Zerger & Mauer LLP v. City of Greenwood*,
  751 F.3d 928 (8th Cir. 2014) ..............................................................................20-21

## Rules & Statutes

Ark. Code Ann. § 20-64-105......................................................................................9

Fed. R. Civ. P. 12 .....................................................................................................12

Fed. R. Civ. P. 56 .....................................................................................................12

## Other Authorities

PHARMACY, *PharmBd July 28th 2026 Informal Conference Review - PM*
  (YOUTUBE, July 28, 2026), https://tinyurl.com/4enc44rh ..................................... 11

## INTRODUCTION

Bristol Myers Squibb Company ("BMS") asks this Court to preliminarily enjoin the Arkansas State Board of Pharmacy's ("Board") enforcement of Act 630 against BMS. BMS principally relies on this Court's preliminary ruling in *Novartis Pharmaceuticals Corp. v. Griffin*, No. 4:25-cv-00633-LPR, 2026 WL 1382468 (E.D. Ark. May 17, 2026), and seeks the same relief for itself. But *Novartis* does not carry BMS's burden of showing that BMS is entitled to "an extraordinary and drastic remedy" of a preliminary injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). BMS waited nearly a year while Novartis litigated its challenge, filed only after Novartis obtained preliminary relief, and now seeks preliminary injunctive relief in a materially different factual posture. BMS cannot surmount the threshold defect of mootness given the Board's intervening non-enforcement resolution and approval of an Act 630 settlement framework. Even setting aside the merits, BMS cannot establish the irreparable harm or show that the merged balance-of-the-equities and public-interest factors favor preliminary relief.

As a preliminary matter, BMS's timing undermines its claimed emergency. Although Act 630 was enacted in April 2025 (and Novartis filed its challenge in June 2025), BMS waited until June 23, 2026—more than 14 months after the Act's enactment—to challenge the law. *See infra*, at 7–8. Defendants acknowledge that their subsequent extension requests added a few weeks to the briefing schedule, during which the parties pursued good-faith efforts to resolve this litigation without further proceedings. *See, e.g.,* ECF Nos. 18, 21, 23. But those efforts don't alter BMS's preceding 364-day delay, which undercuts BMS's claims that it needs immediate relief. Whatever urgency BMS now asserts is therefore largely of its own making, not the product of circumstances warranting immediate intervention by this Court. Rewarding BMS's wait-and-hurry-up approach would also contravene this Court's warning against "incentiviz[ing] litigation gamesmanship" that

6

produces "completely unnecessary and avoidable fire-drills for the Court." *Roth et al. v. Jones, et al.*, Text Order, ECF No. 6, No. 4:25-cv-00733-LPR (E.D. Ark. July 21, 2025) (hereinafter "*Roth*, Text Order").

The factual landscape has also materially changed since this Court ruled in *Novartis*. After this Court issued its preliminary *Novartis* ruling, the Board considered the appropriate course forward and took formal, unanimous actions. First, the Board unanimously authorized settling Act 630 challenges and agreed to not enforce Act 630 against those entities that had filed suit or were threatening to file suit. *Supra*, at 8. Second, to avoid unnecessary litigation that would waste taxpayer dollars and parties' resources, *id.*, the Board voted unanimously that it "will *not* take *any* action to enforce Act 630 of 2025 against *any* entity" in light of the Court's recent *Novartis* decision and its desire "to abide by the United States Constitution." *Id.* at 9. The Board then removed all Act 630 applications from its agenda because no review was necessary given its decision to not take any action to enforce Act 630. *Id.*

Given the different circumstances facing BMS now from what faced Novartis 13 months ago, BMS cannot show imminent, irreparable harm to justify an "extraordinary and drastic" preliminary injunction. *Mazurek*, 520 U.S. at 972. Every alleged future injury identified in BMS's motion—permit costs, forced network changes, federal compliance risk, state penalties, lost Medicaid coverage, and reputational harms—presupposes that the Board will require BMS to comply with Act 630 or otherwise penalize BMS for noncompliance. ECF No. 14, at 32–39; McCarthy Decl., ECF No. 13-1, ¶¶ 46–64. With enforcement expressly disclaimed by a *unanimous* Board vote, BMS cannot establish that any of those alleged contingent harms are likely to occur absent preliminary relief. And the expenses BMS claims it *already* incurred in evaluating and

challenging the Act, *see, e.g.,* McCarthy Decl. ¶ 48, are *past* expenditures that a preliminary injunction cannot prevent or remedy. And the costs of evaluating a new law cannot constitute irreparable harm to justify a preliminary injunction. Otherwise the irreparable-harm factor would be satisfied any time the law changes one iota. Apprising oneself of legal changes as a regulated entity is simply the cost of doing business.

BMS also cannot show the merged balance-of-the-equities and public-interest factors favor a preliminary injunction here. The Board has established a non-enforcement status quo applicable to every entity, regardless of whether it settles, and has approved settlement terms for parties that wish to enter into a binding agreement that they could move to enforce if the Board subsequently breached the settlement agreement. Accordingly, the Court should therefore deny BMS's preliminary-injunction motion in its entirety.

What's more, the Court should dismiss the Complaint. The Board's categorical non-enforcement resolution and removal of all Act 630 applications from its agenda eliminate any live controversy over the prospective enforcement BMS challenges, rendering its claims moot. And the same absence of any imminent threat of enforcement independently forecloses BMS's reliance on *Ex parte Young* to overcome sovereign immunity. Because those jurisdictional defects leave the Court without subject-matter jurisdiction, BMS is not only unlikely to succeed on the merits, but its suit also cannot even survive a motion to dismiss.

**BACKGROUND**

Three factual developments define the present posture of this case. *First*, the *Novartis* litigation proceeded publicly for nearly a year during which BMS could have sought relief, but did not. *Second*, BMS waited more than a year after Act 630's passage—and more than a month after this Court's *Novartis* ruling—to file this action, then sought preliminary relief just three days later

and characterized the matter as an emergency (albeit they later agreed to modest extensions as the parties engaged in good-faith negotiations to try to resolve this matter). *Third*, following the *Novartis* ruling, the Board unanimously authorized a settlement framework for pending and threatened Act 630 challenges. The Board also adopted a categorical non-enforcement resolution and removed pending Act 630 applications from its agenda.

### A. Act 630's enactment and the *Novartis* litigation supplied a lengthy and public procedural backdrop.

Arkansas enacted Act 630 of 2025 on April 16, 2025.[1]  The Act became effective on August 5, 2025, and the manufacturer compliance requirements relevant here were scheduled to begin on September 1, 2026. *See* Act 630 § 3; ECF No. 14, at 18.[2]  Novartis Pharmaceuticals Corporation ("Novartis") filed its constitutional challenge to Act 630 on June 24, 2025. *See Novartis* Compl. 1, ECF No. 1, No. 4:25-cv-00633-LPR.  On May 17, 2026, this Court preliminarily enjoined Defendants from enforcing Act 630 against Novartis after concluding "that Act 630 likely violates the Dormant Commerce Clause." *Novartis*, 2026 WL 1382468, at *20.  That relief, however, was appropriately limited to Novartis, *id.* at *30, and did not extend to BMS, which was not a party to that action.

### B. BMS waited until after this Court's *Novartis* ruling—and more than a year after Act 630's passage—to seek preliminary relief.

BMS filed this action on June 23, 2026—just one day shy of a *year* after Novartis brought its challenge. Compl., ECF No. 1.  Three days later, BMS moved for a preliminary injunction and an administrative stay, pointing to an "imminent application deadline" and warning that

---

[1] Act 630 is codified at Arkansas Code Annotated § 20-64-105.

[2] Due to pagination discrepancies, all pin cites herein to ECF documents refer to the page number in the blue ECF stamp at the upper righthand side of the page.

"[d]raconian penalties" would soon "kick in." Pl.'s Mot. for PI, ECF No. 13, at 4; Pl.'s Br. in Supp. of Mot. for PI, ECF No. 14, at 32 (hereinafter "Pl.'s Br."). BMS alleges that compliance with Act 630 would require it to seek Board permits, change six existing limited distribution networks, incur unrecoverable costs, risk federal enforcement, and face $10,000 daily penalties and loss of state-funded coverage if it did not comply. *See* Pl.'s Mot. for PI, at 3; McCarthy Decl. ¶¶ 46–64. During the ensuing briefing, Defendants pursued good-faith efforts to resolve this litigation without further proceedings, and this Court granted Defendants' unopposed requests to extend the briefing schedule for that purpose. *See, e.g.,* ECF Nos. 18, 21, 23.

BMS's asserted need for immediate relief rests on developments immediately preceding its challenge. BMS asserted that the Board's June 16, 2026 announcement that it would continue enforcing Act 630 against manufacturers other than Novartis left BMS "with no choice" but to sue. Pl.'s Br. at 7. BMS also relied on a July 15, 2026 application deadline and the September 1, 2026 compliance deadline to support its since-withdrawn request for an administrative stay. *Id.* at 37–39. Yet Act 630 had been on the books since April 2025, and Novartis had been litigating its Act 630 challenge for nearly a year before BMS filed. BMS thus filed its challenge only after this Court granted Novartis preliminary relief and then invoked the approaching implementation deadlines as the basis for immediate judicial intervention.

**C. The Board unanimously adopted a categorical non-enforcement resolution, unanimously authorized a settlement framework for Act 630 litigation, and removed pending Act 630 applications from its agenda.**

On July 28, 2026, the Board adopted two formal and unanimous resolutions and took a related action that materially changed the factual posture of this case from that of *Novartis*.

10

*First*, the Board unanimously voted to "authorize the Arkansas Attorney General's Office to enter into a settlement agreement, on [the Board's] behalf, with each entity who has sued or is threatening to sue the Board or its members to challenge Act 630 of 2025 . . . in light of the [Court's] recent opinion . . . in *Novartis*." ARK. STATE BD. OF PHARMACY, *PharmBd July 28th 2026 Informal Conference Review - PM*, at 36:18–40:17 (YOUTUBE, July 28, 2026), https://tinyurl.com/4enc44rh (hereinafter "Board Vote"). The approved terms provide that, once a settlement agreement becomes effective and any pending Act 630 challenge is dismissed without prejudice, the Board, its members, *and their official-capacity successors* will not enforce Act 630 against the settling entity or its subsidiaries, officers, employees, agents, successors, or assigns, or seek fines, penalties, or other sanctions for noncompliance, regardless of when that noncompliance occurred. *Id.* In exchange, the settling entity must refrain from bringing another Act 630 challenge unless the Board attempts enforcement in violation of the agreement—thereby fully preserving the entity's rights. *Id.*

*Second*, the Board voted unanimously to approve an Act 630 non-enforcement resolution providing, in relevant part:

> [T]he Board will *not* take *any* action to enforce Act 630 of 2025 against *any* entity . . . in light of the [Court's] recent opinion . . . [that] determined that Act 630 is likely unconstitutional. It is the desire of this Board to abide by the United States Constitution, and conserve resources and avoid any unnecessary litigation. Therefore, [the Board's non-enforcement resolution] includes both entities that enter into any settlement agreement authorized by the Board, as well as entities that do not enter into any such settlement agreement.

*Id.* at 46:02–47:17 (emphasis added).

*Finally*, consistent with those resolutions, the Board removed Act 630 applications from its agenda because no review was necessary. *Id.* at 47:35–46 ("That would conclude all of our business on [Act] 630 for today and tomorrow, we don't need those packets or anything any longer with

11

those agreements."); *see also id.* at 45:53 ("If we plan to take no action, there's no point in [processing applications]."). No Act 630 applications remain before the Board for consideration.

The same day, undersigned counsel discussed the Board meeting with BMS's counsel and that the Board unanimously resolved at the meeting not to enforce Act 630 against any entity, including BMS, and that Board-approved settlement terms were available to BMS to resolve this case without further litigation.

## LEGAL STANDARDS

"Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move for dismissal of a claim for lack of jurisdiction." *Malinowski v. United States*, No. 4:25-CV-00486-LPR, 2026 WL 1750072, at *4 (E.D. Ark. June 17, 2026). When, as here, defendants raise a "'factual attack' on jurisdiction" under Rule 12(b)(1), courts may "consider[] matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* at *28 (quoting *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016)); *see also Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Consideration of that factual record "does not convert the 12(b)(1) motion to one for summary judgment," because Rule 12 does not prescribe Rule 56 treatment for a factual challenge to subject-matter jurisdiction. *Id.* at *4, n.35 (quoting *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 637 n.4 (8th Cir. 2003)). Thus, "[i]n a factual attack, 'the party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence.'" *Id.* (quoting *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018)).

"Under Article III of the Constitution, [courts] may adjudicate only actual, ongoing cases or controversies," and "[w]hen the issues presented in a case are no longer live, the case is moot." *Whitfield v. Thurston*, 3 F.4th 1045, 1047 (8th Cir. 2021). "Mootness goes to the very heart of Article III jurisdiction, and any party can raise it at any time." *In re Smith*, 921 F.2d 136, 138 (8th

12

Cir. 1990). "In general, a pending claim for injunctive relief becomes moot when the challenged conduct ceases and there is no reasonable expectation that the wrong will be repeated." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1024 (8th Cir. 2012) (citation omitted). Courts "properly dismiss a claim as moot 'if it has lost its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract questions of law.'" *Id.* (quoting *Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 976 (8th Cir. 2009)).

To show entitlement to the "extraordinary remedy" of a preliminary injunction, the plaintiff must make a "clear showing" of four factors: "[1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 22 (2008). "The burden of establishing the propriety of an injunction is on the movant," who must show the alleged "irreparable injury is *likely* in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "The balance-of-harms and public-interest factors merge" when the government is the nonmoving party. *Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022) (quotation omitted). "In balancing the equities, [courts] weigh 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Comp. Apps., Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys.*, 640 F.2d at 113). In weighing these merged factors, courts consider the alleged "harm against the 'serious[] and irreparabl[e] harm' that an injunction would

inflict on the State [and the public] by 'barring the State from'" implementing its enacted laws. *Eggers*, 48 F.4th at 567 (quoting *Abbott v. Perez*, 585 U.S. 579, 602 (2018)).

**ARGUMENT**

BMS has not carried its burden to justify the extraordinary remedy of a preliminary injunction. Its motion rests on a threatened enforcement posture that simply does not exist and on an asserted emergency largely of its own making.

*First*, BMS cannot demonstrate a likelihood of success on the merits given the threshold justiciability defects: mootness and the absence of any alleged threat of imminent enforcement. The Board has formally authorized a settlement framework, adopted a non-enforcement resolution that applies to all entities, and removed all Act 630 applications from its agenda. For the same reasons, BMS lacks standing to seek prospective relief where there is no imminent threat of Act 630 enforcement. Those threshold defects leave BMS without a live basis for the prospective relief it seeks. It also means this suit should be dismissed as moot.

*Second*, BMS cannot establish irreparable harm because the Board has formally and unanimously resolved not to enforce Act 630 against any entity and has removed all Act 630 applications from its agenda. BMS's remaining alleged harms fare no better: BMS's asserted enforcement risk depends on a chain of contingent events, while the expenses it has already incurred in evaluating Act 630 and its distribution networks are past expenditures that a preliminary injunction cannot prevent or remedy. What's more, the Board has approved settlement terms available to BMS that would provide additional, binding protection against its alleged enforcement harms. And BMS's year-long delay further undermines any claim of urgency.

*Third*, the merged balance-of-the-equities and public-interest factors do not favor immediate judicial intervention. The Board has already established a non-enforcement status quo

14

applicable to every entity, regardless of whether it settles, while separately offering a framework for resolving Act 630 challenges. The public interest weighs against rewarding BMS who belatedly filed suit and continues to needlessly consume party and judicial resources and impose additional expense on Arkansas taxpayers when it faces no risk of future harm from Act 630's enforcement, much less imminent or irreparable harm.

Because BMS cannot satisfy these requirements for extraordinary relief, it is not entitled to a preliminary injunction. And the justiciability defects mean the suit should be dismissed. Accordingly, the Court should deny BMS's preliminary-injunction motion and grant Defendants' motion to dismiss.

## I. The Court should dismiss the case and deny the preliminary-injunction motion because there is no imminent threat of enforcement.

Mootness and sovereign immunity resolve this case at the threshold. The Board's intervening actions eliminate any live controversy, and the same absence of threatened enforcement independently forecloses the *Ex parte Young* basis for prospective relief pleaded in its Complaint. *See* Compl., ¶ 10. Accordingly, BMS cannot carry its burden of proving by a preponderance of the evidence that an actual, ongoing controversy and imminent threat of enforcement remain despite the Board's intervening actions—and thus cannot show that this case survives dismissal. *Moss*, 895 F.3d at 1097.

Here, BMS seeks declaratory and prospective injunctive relief from the Board's implementation or enforcement of Act 630. Compl., ¶¶ 6, 9–10, 119. But the Board has formally and unanimously resolved to not take any action to enforce Act 630 against *any* entity, including entities that do not enter into a settlement agreement. *Supra*, at 9. The Board also removed all pending applications from its agenda. *Id.* Put differently, the Board has already provided BMS the

relief it seeks through this challenge.  And the Board has authorized a settlement framework if any further assurance were necessary.  No "actual, ongoing" controversy remains over the prospective enforcement BMS asks this Court to adjudicate.  *Whitfield*, 3 F.4th at 1047.

Moreover, the Board's resolutions are categorical, not conditional.  The resolutions do not postpone enforcement, suspend a deadline, or limit non-enforcement to entities that execute settlements.  Rather, the non-enforcement resolution provides that "the Board will not take *any* action to enforce Act 630 of 2025 against *any* entity" and expressly includes non-settling entities.  *Supra*, at 9.  That language plainly extends to BMS and covers any alleged form of enforcement contemplated in its complaint and motion.  There is no remaining "reasonable expectation" that the Board will require BMS to submit applications, restructure its distribution networks, pay penalties, or otherwise risk the loss of state-funded coverage—the very harms BMS alleges in this suit.  *Beaulieu*, 690 F.3d at 1024.  Accordingly, the Court should "avoid advisory opinions on abstract questions of law" and "properly dismiss" BMS's claims as moot because this case no longer presents a "live controversy."  *Id.*

Nor can BMS escape mootness by invoking the voluntary-cessation exception.  That doctrine ordinarily addresses the cessation of challenged conduct that previously occurred or was ongoing, as "[t]he purpose of this exception is to deny the mootness defense to a defendant who may be seeking to 'engage in unlawful conduct, *stop when sued* to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.'"  *LaBatte v. Gangle*, 161 F.4th 1109, 1117 (8th Cir. 2025) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)) (emphasis added).  Here, however, the Board has never enforced Act 630 against BMS— or any other entity.  There is therefore no prior course of enforcement capable of "recurring" or

enforcement to "stop when sued." *Id.* At most, BMS alleges a threatened first instance of enforcement that the Board has now formally foreclosed.

Even assuming that doctrine applies to the Board's actions, voluntary cessation moots a case when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to *recur*." *W. Virginia v. EPA*, 597 U.S. 697, 720 (2022) (quoting *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (emphasis added). Instructively, the Supreme Court has found that standard unmet where the government either failed to disavow future use of the challenged policy or affirmatively indicated that renewed enforcement remained contemplated. In *Mullin v. Al Otro Lado*, for example, the federal government described a rescinded immigration policy as an "important tool" that it "would likely resume," making clear that the challenged conduct remained a possibility. 146 S. Ct. 2079, 2090 n.7 (2026). The Board, by contrast, has left no such door open. The Board's public and unanimously approved settlement framework corroborates that its non-enforcement position is a settled course, not a temporary pause: the framework offers settling entities binding protection against *past* and *future* enforcement by the Board, its members, *and* their official-capacity successors. *Supra*, at 8–9. More fundamentally, the Board resolved that it "will not take any action to enforce Act 630 of 2025 against any entity," including non-settling entities, and removed every Act 630 application from its agenda. *Id.* The Board has carried its "heavy" burden of making it "absolutely clear" that the challenged enforcement will not recur, as those formal, categorical actions contain no reservation of future enforcement and extend beyond BMS and this litigation. *W. Virginia*, 597 U.S. at 719–20. There is therefore "no reasonable expectation that the [challenged enforcement] will be repeated." *Beaulieu*, 690 F.3d at 1024.

In any event, the lack of enforcement also means that BMS cannot invoke "*Ex parte Young*'s historic exception to state sovereign immunity." *Minn. Chapter of Assoc. Builders & Contractors v. Ellison*, 153 F.4th 695, 701 (8th Cir. 2025), *cert. denied*, 146 S. Ct. 1603 (2026).  BMS invokes *Ex parte Young* as the jurisdictional basis for its request for prospective relief against the Board members in their official capacities.  *See* Compl., ¶ 10.  But that exception requires both a connection to enforcement and imminence: the state officer must "threaten and [be] about to commence proceedings." *Ellison*, 153 F.4th at 698 (quoting *Ex parte Young*, 209 U.S. 123, 156–57 (1908)) (alteration in original); *see Whole Woman's Health v. Jackson*, 595 U.S. 30, 56 (2021) (Thomas, J., concurring in part and dissenting in part) (emphasizing that "the prospect of state suit must be imminent") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992)).  The latter requirement is dispositive here.  In *Ellison*, the Eighth Circuit explained that, although the Minnesota Attorney General possessed enforcement authority, his declaration that he had "no present intention to commence" enforcement meant that the plaintiffs "lack[ed] standing to sue, divesting the district court of subject matter jurisdiction." 153 F.4th at 702 (quoting *Auer v. Trans Union, LLC*, 902 F.3d 873, 877 (8th Cir. 2018)).  That conclusion accords with *Whole Woman's Health*, where a unanimous Supreme Court held that plaintiffs "c[ould] not establish personal injury fairly traceable to [the private defendant's] allegedly unlawful conduct," after the defendant supplied "sworn declarations" stating that "he possesse[d] no intention to file an . . . suit against them." 595 U.S. at 48 (2021) (remanding for dismissal of claims against private defendant for lack of standing).  Here, the Board's formal actions provide even stronger evidence that enforcement is *not* imminent: it authorized a settlement framework through which BMS may obtain binding protection against enforcement, it unanimously resolved to not enforce Act 630 against any entity,

and removed all Act 630 applications from its agenda.  No Board member therefore "threaten[s] and [is] about to commence" enforcement proceedings against BMS.  *Ellison,* 153 F.4th at 698. Without that required imminence, BMS cannot invoke *Ex parte Young* to overcome sovereign immunity.  *Id.* at 701–02.

That is true for both the sought injunctive relief and declaratory relief. *Ex parte Young* permits federal courts to award *prospective* declaratory relief to *ongoing* violations of federal law, but it does not authorize declarations that state officials violated federal law in the *past.  Cf. Just. Network Inc. v. Craighead County*, 931 F.3d 753, 764 (8th Cir. 2019) ("'[D]eclaratory relief is limited to prospective declaratory relief."); *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 530–31 (8th Cir. 2005); *Smith v. Reynolds*, 139 F.4th 631, 637–38 (8th Cir. 2025) (explaining that declaratory relief is intended "to define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act"). Because there is no imminent threat of enforcement, BMS's request for declaratory and permanent injunctive relief has "lost its character as a present, live controversy."  *See Beaulieu*, 690 F.3d at 1024.  Relatedly, BMS cannot overcome sovereign immunity because there is no imminent threat of enforcement, so its claims fall outside the narrow *Ex parte Young* exception.  With these jurisdictional defects, BMS is not only unlikely to succeed on the merits, but its suit also cannot even survive a motion to dismiss.

**II.**   **BMS cannot establish irreparable harm because its own delay belies the asserted urgency, and, in any event, the Board's formal actions eliminate the threatened enforcement on which BMS's alleged injuries depend.**

Even assuming BMS could establish a likelihood of success on the merits, its motion fails because it cannot demonstrate likely irreparable harm absent preliminary relief.  BMS cannot carry its burden for two independent reasons: *First*, its substantial and unexplained delay defeats its

asserted need for immediate relief. *Second*, in any event, the Board formally resolved not to enforce Act 630 against any entity and has removed all Act 630 applications from its agenda, eliminating the threatened enforcement on which BMS's alleged future harms depend. Accordingly, BMS cannot make the "clear showing" of irreparable harm required for an "extraordinary and drastic remedy." *Mazurek*, 520 U.S. at 972.

### A. BMS's substantial delay defeats its claim of irreparable harm.

Even if BMS's request for a preliminary injunction presents an emergency, "it is an emergency of [BMS's] own making." *Roth*, Text Order, ECF No. 6, No. 4:25-cv-00733-LPR (E.D. Ark. July 21, 2025) (denying plaintiffs' request for an expedited preliminary injunction hearing shortly before a law was set to go into effect where plaintiffs should have known of the law's approaching effective date for two months).

"[A] plaintiff must generally show 'reasonable diligence' in seeking a preliminary injunction." *Kohls v. Ellison*, 166 F.4th 728, 733 (8th Cir. 2026) (quoting *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam)). As the Eighth Circuit has explained, "an unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction." *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (citation modified). Indeed, the Eighth Circuit has treated a one-year delay as sufficient grounds to deny a preliminary injunction. *See Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 806 (8th Cir. 2021) ("[T]he district court did not abuse its discretion in concluding that the Hospitals' *one-year* delay refuted their allegations of irreparable harm." (emphasis in original)). Courts also possess "inherent authority to manage" their dockets "so as to achieve the orderly and expeditious disposition[s]," *Zerger & Mauer LLP v. City of Greenwood*, 751 F.3d 928, 931 (8th Cir.

20

2014), rather than preliminary-injunction practices that "force judges into making rushed, high-stakes, low-information decisions," *cf., e.g., DHS v. New York*, 589 U.S. 1173, 1176 (2020) (Gorsuch, J., concurring).

Here, Act 630 had been on the books for more than fourteen months—and effective for nearly a year—before BMS filed this action. Novartis likewise had been publicly litigating its challenge for nearly a year. Yet BMS remained on the sidelines until June 23, 2026—364 days after Novartis filed its challenge and more than a month after this Court granted Novartis preliminary relief. Defendants acknowledge that their unopposed extension requests added a few weeks to the briefing schedule. But, as those filings explained, the extensions facilitated Defendants' good-faith efforts to resolve this litigation without further proceedings and thereby conserve the resources of the parties, the Court, and Arkansas taxpayers. *See* ECF Nos. 18, 21, 23. Those extensions neither alter BMS's preceding 364-day delay nor lend urgency to its request for immediate relief. That chronology remains incompatible with the "reasonable diligence" required of a party seeking preliminary relief. *Kohls*, 166 F.4th at 733.

Indeed, BMS's 364-day delay closely parallels the year-long delay the Eighth Circuit treated as sufficient to deny preliminary relief in *Adventist Health*. 17 F.4th at 806. There, the hospitals waited one year after the challenged policy was adopted and "until the eve of implementation" to seek relief, even though they "knew of [the policy's] alleged drawbacks well in advance." *Id.*. The Eighth Circuit rejected the hospitals' contention that delay mattered only after the policy took effect, reasoning that the hospitals "would not have delayed in seeking injunctive relief . . . if their alleged financial harms were truly irreparable," and held that their "*one-year* delay refuted their allegations of irreparable harm." *Id.* (emphasis in original). The same is true here. BMS would

not have delayed seeking relief if its alleged harms were truly irreparable. What's more, BMS offers no persuasive explanation for waiting until after Novartis obtained an injunction to seek relief for itself—a delay nearly identical in duration to the one-year delay that the Eighth Circuit affirmed as refuting irreparable harm in *Adventist Health*. *See id*. Because "an unreasonable delay in moving for the injunction" can itself constitute "a sufficient ground to deny a preliminary injunction," BMS's unexplained delay directly "undermine[s]" its assertion that irreparable injury is sufficiently imminent to warrant preliminary relief. *Ng*, 64 F.4th at 997.

Nor did the September 1, 2026 compliance deadline arise unexpectedly. BMS knew of that deadline while Novartis's challenge proceeded, yet BMS took no action itself. Only after Novartis prevailed did BMS point to an "imminent application deadline" and warn that "[d]raconian penalties" would soon "kick in." Pl.'s Mot. for PI, ECF No. 13, at 4; Pl.'s Br. at 38. That is precisely the "wait-and-hurry-up approach" this Court has declined to reward because it would "incentiviz[e] litigation gamesmanship" and produce "completely unnecessary and avoidable fire-drills for the Court." *Roth*, Text Order, ECF No. 6, No. 4:25-cv-00733-LPR (E.D. Ark. July 21, 2025).

Even if the Court determines that BMS's unexplained delay and litigation gamesmanship do not independently defeat its claim of irreparable harm, they weigh heavily against it. Permitting BMS's approach would allow a plaintiff to sit out another litigant's challenge, await a favorable ruling, and then invoke long-known implementation deadlines to demand expedited relief in a new action. That is not the preservation of the existing "status quo" as contemplated by the Eighth Circuit, *Tumey*, 27 F.4th at 664; it is a request for expedited relief made pressing by BMS's own

22

decision to wait until known deadlines approached and then attempt to capitalize on Novartis's success.

That chronology leads to a straightforward conclusion: BMS did not exercise the "reasonable diligence" required of a party seeking preliminary relief, *Kohls*, 166 F.4th at 733, and its 364-day delay after learning of the alleged threatened harm is precisely the kind of conduct that indicates "the harm would not be serious enough to justify a preliminary injunction," *Adventist Health*, 17 F.4th at 805. BMS cannot convert the urgency created by its own litigation choices into the "clear showing" necessary to obtain an "extraordinary and drastic remedy." *Mazurek*, 520 U.S. at 972. And because BMS has not carried its burden to show that irreparable harm is likely absent an injunction, its request for extraordinary relief fails at the threshold. *See Tumey*, 27 F.4th at 665; *Winter*, 555 U.S. at 22.

### B. There's no threat of imminent, irreparable harm.

Every prospective harm BMS identifies—permit expenses, compelled changes to six limited distribution networks, federal-compliance risk, state penalties, loss of state-funded coverage, and reputational injury—depends on the same predicate: that the Board will require BMS to comply with Act 630 or penalize it for noncompliance. Pl.'s Br. at 32–39; McCarthy Decl. ¶¶ 46–64.

For the same reason BMS's claims are moot, that predicate enforcement posture is absent here too. *See supra*, at 13–17. The Board has formally and unanimously resolved that it "will not take *any* action to enforce Act 630 of 2025 against *any* entity," expressly including entities that refuse to enter into a settlement agreement, and has implemented that resolution by removing pending Act 630 applications from its agenda. *Supra*, at 9. BMS therefore cannot identify any

evidence that it faces any pending application review, compliance demand, penalty proceeding, or other Act 630 enforcement action.  To the extent BMS argues it "*may* need to pause distribution of its drugs in Arkansas to maintain compliance with federal and state law," because there is "no guarantee the Board will act before the law takes effect in September 2026," McCarthy Decl. ¶ 51 (emphasis added), the Board's resolutions demonstrate BMS's arguments were based on unsupported speculation.  And in any event, speculation about the mere "'possibility' of irreparable harm" is not sufficient to carry the movant's burden.  *Tumey*, 27 F.4th at 665 (quoting *Dataphase*, 640 F.2d at 114).  BMS has failed to carry its burden to show that its alleged injury is "*likely* in the absence of an injunction." *Id*.  Indeed, those enforcement-dependent harms will not occur because the Board is not reviewing Act 630 applications, requiring network changes, pursuing penalties, threatening loss of coverage, or otherwise taking any other enforcement action against BMS or anyone else.

BMS's asserted risk of FDA enforcement is more attenuated still.  BMS portrays itself as caught "in an inescapable double bind:" either alter its federally regulated distribution networks at "federal enforcement risk, or violate state law and trigger severe penalties and exclusion from the Arkansas market."  Pl.'s Br. at 32; *see also* McCarthy Decl. ¶¶ 54–60.  In effect, BMS casts itself as forced to steer between Scylla and Charybdis.  The Board's formal actions, however, have opened a safe course by entirely eliminating one of the (alleged) hazards: its categorical resolution removes any state-law pressure to alter BMS's networks, applies to every entity, and has been implemented by removing pending Act 630 applications from the Board's agenda.  The Board's approved settlement framework also provides separate, binding protection against enforcement for past and future noncompliance—including enforcement by the Board's official-capacity successors—for

BMS or anyone else who wants to accept the approved terms. *Supra*, at 9. Thus, BMS need not make the network changes it claims would create federal enforcement risk—and faces no threat of Act 630 enforcement if it declines to make them. Under BMS's own theory, the Board's actions have eliminated the forced choice on which its asserted harms depend. BMS therefore has not shown that either harm is "likely in the absence of an injunction." *Tumey*, 27 F.4th at 665.

Nor can BMS substitute already-incurred expenses for the missing prospective injury likely to occur in the absence of injunctive relief. In asserting that "compl[iance] with the Act will irreparably harm BMS and the patients it serves in myriad ways," McCarthy Decl. ¶ 47, BMS points to the "significant time and resources" already devoted to "evaluating the Act and its networks," "multiple in-house teams," and "the advice of outside counsel," *id*. at ¶ 48. BMS also complains that "[e]valuating the Act has proven challenging and resource-intensive." *Id*. at ¶ 49. But those are past costs, not threatened injuries. Because an injunction entered now could neither prevent nor remedy them, BMS cannot rely on those expenditures to establish an injury likely to occur "in the absence of an injunction." *Tumey*, 27 F.4th at 665.

For these independent reasons, BMS cannot establish it is *likely* to experience irreparable harm "before a decision on the merits can be rendered." *Tumey*, 27 F.4th at 665. Its 364-day delay belies any need for immediate judicial relief, the Board has categorically disclaimed enforcement, and BMS may obtain additional binding protection through settlement. Its remaining costs are already incurred and cannot be remedied by prospective relief. BMS therefore cannot make the "clear showing" required for this "extraordinary and drastic remedy," *Mazurek*, 520 U.S. at 972, and that failure independently warrants denial of preliminary relief, *see, e.g., Adventist Health*, 17 F.4th at 806.

III.    **The merged balance-of-the-equities and public-interest factors weigh decisively against preliminary injunctive relief.**

The remaining merged factors weigh decisively against preliminary relief. BMS places little, if anything, on its side of the equitable scale. Its arguments—that an injunction is needed to "preserve the status quo," "protect patient safety," and "ensure continued compliance with federal law"—all presuppose that the Board will enforce Act 630 and require BMS to alter its distribution networks. Pl.'s Br. at 9. But the immediate protection BMS seeks—freedom from enforcement of Act 630 while this litigation proceeds—already exists under the Board's categorical resolution (not to mention the available settlement framework).

Moreover, the Board's non-enforcement status quo materially distinguishes this case from *Novartis*. There, the Court determined that the merged factors tipped only "very slightly in Novartis's favor" while the Board maintained the enforcement posture that gave rise to Novartis's asserted compliance burdens. *Novartis*, 2026 WL 1382468, at *30. Here, that enforcement threat—and thus the principal harm BMS places on its side of the scale—is absent.

At bottom, Arkansas taxpayers should not be required to finance duplicative Act 630 preliminary-injunction litigation merely because BMS prefers a federal injunction to the protection the Board has already provided and made available in binding form, to all entities. Continuing down that path would unnecessarily consume party and judicial resources and encourage the sort of "litigation gamesmanship," *Roth*, Text Order, and preliminary-injunction practice that produces "rushed, high-stakes, low-information decisions," *DHS*, 589 U.S. at 1176. Moreover, rewarding BMS's delay with a preliminary injunction that piggybacks on Novartis's would create a pernicious roadmap for future challengers to state laws: by allowing another entity to first test the litigation waters, the plaintiff avoids the risk of any adverse ruling against itself—and could even select a

different forum if the defendant prevails in the first suit.  In other words, it's heads I win, tails you lose.  The equities do not favor such an outcome.  Nor do they favor requiring Defendants, the Court, and ultimately, Arkansas taxpayers, to expend additional resources on duplicative litigation that BMS chose to pursue.

In sum, BMS has not demonstrated "by a clear showing" its entitlement to "an extraordinary and drastic remedy," *Mazurek*, 520 U.S. at 972, and its motion should be denied.

### CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for a preliminary injunction, ECF No. 13, and grant Defendants' motion to dismiss for lack of subject-matter jurisdiction in its entirety.


Respectfully submitted,


By:    /s/ Jordan Broyles
       Jordan Broyles, Ark. Bar No. 2015156
       Senior Assistant Attorney General

       Office of the Arkansas Attorney General
       Bob R. Brooks Jr. Justice Building
       101 West Capitol Avenue
       Little Rock, AR 72201
       (501) 301-0169, (501) 682-2591 fax
       Jordan.Broyles@arkansasag.gov

       *Counsel for Defendants*