**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | |
|---|---|
| BRISTOL MYERS SQUIBB COMPANY,<br>*Plaintiff*,<br>v.<br>DEBBIE MACK, *et al.*,<br>*Defendants*. | Civil Action No. 4:26-cv-00618-LPR |

**BRISTOL MYERS SQUIBB COMPANY'S COMBINED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Kevin F. King*
Kuntal V. Cholera*
MaKade C. Claypool*
Noah C. Zimmermann*
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
kking@cov.com
kcholera@cov.com
mclaypool@cov.com
nzimmermann@cov.com

**Admitted pro hac vice*

John E. Tull III, Ark. Bar No. 84150
R. Ryan Younger, Ark. Bar No. 2008209
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
jtull@qgtlaw.com
ryounger@qgtlaw.com

*Counsel for Plaintiff*
*Bristol Myers Squibb Company*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

SUPPLEMENTAL STATEMENT OF FACTS .......... 3

ARGUMENT .......... 9

I. The Court Should Deny Defendants' Motion to Dismiss. .......... 10

A. This Case Is Not Moot. .......... 10

B. Sovereign Immunity Does Not Bar This Suit. .......... 14

II. The Court Should Enter Summary Judgment for BMS. .......... 20

A. Standard of Review. .......... 20

B. Act 630 Violates Dormant Commerce Clause Principles. .......... 21

C. Federal Law Preempts Act 630. .......... 28

D. Act 630 Is Void for Vagueness. .......... 33

CONCLUSION .......... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*281 Care Committee v. Arneson*,
638 F.3d 621 (8th Cir. 2011) ....................18

*281 Care Committee v. Arneson*,
766 F.3d 774 (8th Cir. 2014) ....................19, 20

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)....................10, 13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................20

*Ass'n for Accessible Medicines v. Ellison*,
140 F.4th 957 (8th Cir. 2025) ....................21, 27

*Bryant v. Stein*,
732 F. Supp. 3d 485 (M.D.N.C. 2024) ....................30

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016)....................10

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982)....................12

*Donathan v. Oakley Grain, Inc.*,
861 F.3d 735 (8th Cir. 2017) ....................21

*Elder v. Gillespie*,
54 F.4th 1055 (8th Cir. 2022) ....................14

*Entergy Arkansas, LLC v. Webb*,
122 F.4th 705 (8th Cir. 2024) ....................25

*FBI v. Fikre*,
601 U.S. 234 (2024)....................10–12, 14, 16

*Felts v. Green*,
91 F.4th 938 (8th Cir. 2024) ....................12

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003) ....................28, 30

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,
528 U.S. 167 (2000)....................10, 14, 16

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*,
541 U.S. 567 (2004)....................16

*Harris v. McRae*,
448 U.S. 297 (1980)....................32

*Hencely v. Fluor Corp.*,
146 S. Ct. 1086 (2026) ........................................................................................28

*Hillesheim v. Holiday Stationstores, Inc.*,
903 F.3d 786 (8th Cir. 2018) ................................................................................13

*Holloway v. Pigman*,
884 F.2d 365 (8th Cir. 1989) ................................................................................21

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..............................................................................................23

*Jones v. Gale*,
470 F.3d 1261 (8th Cir. 2006) .........................................................................23, 24

*K.P. v. LeBlanc*,
729 F.3d 427 (5th Cir. 2013) ...................................................................16, 17, 18

*LaBatte v. Gangle*,
161 F.4th 1109 (8th Cir. 2025) ...............................................................................13

*Lankford v. Sherman*,
451 F.3d 496 (8th Cir. 2006) ...................................................................10, 12, 32

*LSP Transmission Holdings, LLC v. Sieben*,
954 F.3d 1018 (8th Cir. 2020) ...............................................................................25

*McCarthy v. Ozark Sch. Dist.*,
359 F.3d 1029 (8th Cir. 2004) ...............................................................................11

*Minn. Chapter of Assoc. Builders & Contractors, Inc. v. Blissenbach*,
155 F.4th 1015 (8th Cir. 2025) ...............................................................................33

*Minnesota Chapter of Associated Builders & Contractors v. Ellison*,
153 F.4th 695 (8th Cir. 2025) .................................................................................18

*Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*,
499 F.3d 803 (8th Cir. 2007) ................................................................................13

*Mollan v. Torrance*,
22 U.S. 537 (1824)................................................................................................16

*Mullin v. Al Otro Lado*,
146 S. Ct. 2079 (2026)....................................................................................13, 14

*Mutual Pharmaceutical Co. v. Bartlett*,
570 U.S. 472 (2013)..............................................................................................30

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023)......................................................................................21, 22, 27

*Novartis Pharmaceuticals Corp. v. Griffin*,
2026 WL 1382468 (E.D. Ark. May 17, 2026)..............................1, 4, 6, 20–23, 25, 27–29, 33

*Pharm. Rsch. & Mfrs. of Am. v. Williams*,
64 F.4th 932 (8th Cir. 2023) ..................................................................................15

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ........ 25

*R&M Oil & Supply, Inc. v. Saunders*,
307 F.3d 731 (8th Cir. 2002) ........ 26, 27

*R.W. v. Columbia Basin Coll.*,
77 F.4th 1214 (9th Cir. 2023) ........ 16

*Riley's Am. Heritage Farms v. Elsasser*,
2024 WL 1756101 (9th Cir. Apr. 24, 2024) ........ 16, 17, 18

*South Dakota Farm Bureau, Inc. v. Hazeltine*,
340 F.3d 583 (8th Cir. 2003) ........ 25

*Teague v. Cooper*,
720 F.3d 973 (8th Cir. 2013) ........ 13

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) ........ 12

*United States v. Deng*,
104 F.4th 1052 (8th Cir. 2024) ........ 33, 34

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ........ 33

*Vonage Holdings Corp. v. Nebraska Pub. Serv. Comm'n*,
564 F.3d 900 (8th Cir. 2009) ........ 31

*Waste Management Holdings, Inc. v. Gilmore*,
252 F.3d 316 (4th Cir. 2001) ........ 16

*Ex parte Young*,
209 U.S. 123 (1908) ........ 9, 14

**Statutes & Regulations**

21 U.S.C.
§ 333 ........ 29
§ 351 ........ 29
§ 355 ........ 28–30
§ 355-1 ........ 28–30

42 U.S.C.
§ 262 ........ 28
§ 1396a ........ 31–32
§ 1396r-8 ........ 31

Ark. Code Ann.
§ 17-92-204 ........ 8
§ 20-64-105 ........ 4–5, 19, 22, 24, 26, 29–34
§ 23-92-601 ........ 19

H.B. 1531, *An Act to Prohibit Pharmaceutical Manufacturers from Restricting or Limiting Prescription Medications to a Limited Distribution Network of Out-of-State Pharmacies* (codified at Ark. Code Ann. § 20-64-105 (2025)) ....................................1

21 C.F.R. § 314.150 ....................................29

42 C.F.R. § 431.10 ....................................32

**Other Authorities**

Arkansas Department of Human Services, *Division of Medical Services* ....................................32

Arkansas Department of Pharmacy, *Home Page* ....................................6

*Arkansas State Board of Pharmacy June 16th 2026 Board Meeting - PM* (June 16, 2026) ....................................6

FDA, *REMS Assessment: Planning & Reporting Guidance for Industry* (2019) ....................................29

Fed. R. Civ. P. 56 ....................................20

John Clay Kirtley, *Memorandum re: Board Action on Act 630 of 2025* (July 31, 2026) ....................................9

Arkansas State Board of Pharmacy, *PharmBd July 28th 2026 Informal Conference Review - PM* (July 28, 2026) ....................................7

Testimony of Rep. Achor Before the H. Ins. & Com. Comm. (Mar. 19, 2025) ....................................24

U.S. Const. art. I, § 8, cl. 3 ....................................21

This brief addresses two overlapping motions, both of which concern the constitutionality of Arkansas Act 630 of 2025 (the "Act")[1]—a law that remains in effect, and at any time could be enforced by the Arkansas State Board of Pharmacy ("Board") or used to challenge the otherwise lawful and beneficial limited drug distribution networks operated by Plaintiff Bristol Myers Squibb Company ("BMS"). Specifically, this brief (1) opposes Defendants' Motion to Dismiss (ECF 27); and (2) supports BMS's concurrently filed Cross-Motion for Summary Judgment. As described below, and for the reasons already given in *Novartis Pharmaceuticals Corp. v. Griffin*, No. 4:25-cv-00633-LPR, 2026 WL 1382468 (E.D. Ark. May 17, 2026), BMS respectfully requests that the Court deny Defendants' Motion and grant BMS's Cross-Motion.

## INTRODUCTION

Act 630 requires pharmaceutical manufacturers to grant in-state pharmacies special access to networks used to distribute prescription medications. In *Novartis*, this Court held that the Act is likely unconstitutional under Dormant Commerce Clause principles, and it preliminarily enjoined the enforcement of the Act against the plaintiff. *Id.* at *27, *30. Despite the Court's decision, the Board, which is responsible for enforcing the Act, pressed forward—making clear that it would continue to enforce the Act against all other parties. Indeed, following *Novartis*, the Board set imminent deadlines for other manufacturers to apply for permits to continue selling their medications in Arkansas, on pain of significant noncompliance penalties.

BMS filed suit and sought a preliminary injunction barring enforcement of the Act. While that motion was pending, the Board reversed its approach based on the Attorney General's publicly announced conclusion that Act 630 is likely unconstitutional. The Board adopted a new policy

[1] *See* H.B. 1531, An Act to Prohibit Pharmaceutical Manufacturers from Restricting or Limiting Prescription Medications to a Limited Distribution Network of Out-of-State Pharmacies, *as engrossed*, https://perma.cc/VC56-4EAH (codified at Ark. Code Ann. § 20-64-105 (2025)).

stating that it does not plan to enforce the Act's requirements "at this time." Defendants argue that their recent about-face both moots this case and deprives BMS of a cause of action. Neither assertion is correct.

*First*, this case is not moot under the voluntary cessation doctrine, which exists to address this exact scenario. A defendant cannot moot a case by voluntarily ceasing its challenged conduct after a suit is filed unless the defendant proves that there is *no* reasonable likelihood that the conduct will recur; otherwise, the defendant could evade review and then resume its conduct once the suit is dismissed. Defendants cannot satisfy their heavy burden to make that showing. They did not take irrevocable action binding the Board's actions in the future. Instead, they unilaterally adopted a nonenforcement policy that can be reversed or modified at any time by a simple majority vote. Defendants do not dispute the ephemeral nature of the Board's current policy. Indeed, the Board stated that it does not intend to take enforcement action "at this time," and its publicly announced settlement terms similarly acknowledge that the Board remains free to rescind the nonenforcement scheme.

*Second*, Defendants are also incorrect that the nonenforcement policy strips BMS of its cause of action under *Ex parte Young*, which allows plaintiffs to seek equitable relief against state officials without offending state sovereign immunity. Defendants claim that *Ex parte Young* overcomes sovereign immunity only if there is an "ongoing violation" of federal law, and that one no longer exists in light of the Board's voluntary nonenforcement policy. But this is just a repackaged version of Defendants' mootness argument—and it fails for the same reason. Allowing State officials to evade *Ex parte Young* claims through strategic mid-litigation policy shifts would effectively allow them to circumvent this critical tool for vindicating federal rights, frustrate the voluntary cessation doctrine, and erode judicial review. And while Defendants assert that

precedent supports their position, the cases they cite involved fundamentally different circumstances.

Because the Board's nonenforcement policy neither moots this case nor eliminates BMS's cause of action, the Court should deny Defendants' Motion to Dismiss. Furthermore, because Defendants have acquiesced in the Court's *Novartis* order holding that the Act is likely unconstitutional, the Court should concurrently grant summary judgment to BMS, declare that Act 630 is unconstitutional, and permanently enjoin Defendants from enforcing the Act against BMS.

**SUPPLEMENTAL STATEMENT OF FACTS**

This case concerns BMS's "limited" or "restricted" distribution networks—so-called because they limit which dispensers (*e.g.*, medical providers or pharmacies) can distribute certain BMS products. Act 630, which takes effect on September 1, 2026, requires BMS to admit Arkansas-based pharmacies into its limited distribution networks. The Act grants these special access rights to Arkansas-based pharmacies even when they do not meet the criteria applicable in every other state, and even when they do not satisfy safety standards prescribed by federal law.

BMS recently provided this Court with a comprehensive background concerning its limited drug distribution networks and the Board's initial enforcement of the Act despite the *Novartis* decision. *See* ECF 14 at 3–13. BMS incorporates that background here by reference and reiterates several key facts before supplementing the record with facts concerning events that have occurred since the company filed its preliminary injunction motion on June 26, 2026. *See id.*; *see also* ECF 30 (withdrawing BMS preliminary injunction motion).

BMS operates limited distribution networks for six of its products: CAMZYOS® (mavacamten); three immunomodulatory drug (or "IMiD") products, THALOMID® (thalidomide), REVLIMID® (lenalidomide), and POMALYST® (pomalidomide); and two targeted anticancer therapies, AUGTYRO® (repotrectinib) and KRAZATI® (adagrasib). *See* Declaration

of Justin McCarthy ("McCarthy Decl.") ¶ 25. Federally imposed requirements and BMS's desire to improve patient outcomes impel the company to limit the distribution of these drugs to a select group of pharmacies that rely on mail orders to dispense medicines nationwide. *See id.* ¶¶ 27–43. None of these specialty pharmacies are located in Arkansas. *Id.* ¶¶ 31, 37, 42.

Act 630, however, requires BMS to change those networks. The Act prohibits manufacturers from using distribution networks made up of only out-of-state pharmacies (*i.e.*, those located outside Arkansas). *See generally* Ark. Code Ann. § 20-64-105 (2025). And the law imposes significant penalties should a manufacturer fail to comply—*i.e.,* a $10,000 penalty for each day of noncompliance, *id.* § 20-64-105(f), and exclusion from coverage of *all* BMS products from State and local health-benefit plans, including the Arkansas Medicaid program, *id.* § 20-64-105(b)(3), (e).

To comply with Act 630, a manufacturer's distribution network must "hav[e] similar access and allo[w] for upon request or application by a pharmacy at least": (1) "[a] local network of public institution academic medical center access"; (2) "[g]eographic diversity of access within the state"; (3) "[d]iverse access for local for-profit and nonprofit pharmacies in good standing with the [B]oard and that have experience or accreditation in managing expensive specialty or limited distribution medications"; "and" (4) a "pharmacy meeting medication specific [federal] guidance or requirements for" "[p]roper and safe storage, handling, monitoring, and drug delivery," "[p]atient or medication data collection, monitoring, or reporting," and "[p]atient management services." *Id.* § 20-64-105(c)(1)(B). However these individual requirements are interpreted, *see Novartis*, 2026 WL 1382468, at *14, Act 630's bottom-line requirement is clear: A manufacturer *must* give in-state pharmacies special "access" to its limited distribution networks, *see* Ark. Code

Ann. § 20-64-105(c)(1)(B)(i) ("local network"), (ii) ("within the state"), (iii) ("local for-profit and nonprofit pharmacies").

If a manufacturer operates a limited distribution network for six months or more, the manufacturer must first seek and obtain a permit from the Board. *See id.* § 20-64-105(d)(1). The Board then may grant or deny the application based on several factors that it "may consider," including the network's effect on the "mission of the board to promote, preserve, and protect the public health, safety, and welfare of citizens of [Arkansas]," "Costs," "Logistics," "Patient caseload," the "rarity" of the drug or the condition(s) it treats, and "Any other factors unique or relevant to the medication and disease or condition treated." *Id.* § 20-64-105(d)(1)–(2)(A). The Act does not require the Board to limit its consideration to (or even consider) these factors, nor does the Act define those factors or explain how they must be individually or collectively weighed. But unless and until the Board approves a manufacturer's request, the Act prohibits operation of the manufacturer's limited network, triggering the penalties discussed above. *See id.* § 20-64-105(d)(1)(B).

Critically, Board approval does not mean that a manufacturer can maintain its original network of non-Arkansas dispensers. Rather, the Act still requires Board-permitted networks to "allow some pharmacies in this state, upon request or application, to participate and access the medications." *Id.* § 20-64-105(d)(2)(B). These pharmacies must be able to provide "same day access in [Arkansas] without requiring patients to use out-of-state or in-state common mail carriers for access." *Id.*

Because each of BMS's networks discussed above "restrict[s] or limit[s] prescription medications" to a specific class of specialty dispensers, *id.* § 20-64-105(c)(1)(B), the networks are subject to Act 630, *see* McCarthy Decl. ¶ 46. And because each of BMS's networks discussed

above has existed for longer than six months and is intended to remain in place for the foreseeable future, Act 630's provisions prohibit the company from continuing to operate its limited distribution networks within Arkansas unless and until it acquires a permit from the Board. *See* McCarthy Decl. ¶ 46.

On May 17, 2026, this Court enjoined enforcement of Act 630 against a different manufacturer on the ground that the law "likely … violates the Dormant Commerce Clause doctrine" by discriminating against interstate commerce. *Novartis*, 2026 WL 1382468, at *27. The order further reasoned that Act 630 is likely "at least partially" preempted by federal law, *id.* at *21 n.223, and presents serious concerns under the void-for-vagueness doctrine, *id.* at *9 n.137. But the order did not resolve those additional issues. *Id.* at *21 n.223.

BMS and other industry representatives subsequently reached out to the Board and its counsel, urging them to suspend enforcement of the Act for the reasons given in *Novartis*. Nevertheless, the Board pushed forward. On June 16, 2026, the Board stated, during a public meeting, that it would continue to enforce the Act against all manufacturers other than Novartis. *See Arkansas State Board of Pharmacy June 16th 2026 Board Meeting - PM*, at 1:34:00–2:50:00, YouTube.com (June 16, 2026), https://perma.cc/P293-MPN7, *hand-filed under separate cover* as **Exhibit G** to Declaration of Kevin F. King ("King Decl."). Indeed, the Board's Executive Director publicly announced that the Board had a nondiscretionary legal duty to continue enforcing the statute. *See id.* at 1:38:44–1:39:22. Under state law, the Executive Director explained, the Board "ha[d] no choice but to follow what [Act 630] instructs us to do." *Id.* The Board's website similarly noted the "deadlines" by which manufacturers needed to submit their applications under Act 630. *See* Arkansas Department of Pharmacy, *Home Page*, https://perma.cc/5BTK-TDPM (captured June 25, 2026), *attached as* **Exhibit A** to King Decl.

Accordingly, when BMS learned of the Board's intention to continue enforcing Act 630 despite its unconstitutionality, the company was left with no choice but to institute its own suit and seek a preliminary injunction against enforcement of the Act's mandates. *See* ECF 1, 13, 14.

Not long after BMS filed that motion, the parties conferred to discuss resolution of this case without further litigation. As part of those good-faith efforts, BMS consented each time Defendants requested another extension of their filing deadlines. *See, e.g.*, ECF 18, 21, 23. And because the Board continued to implement Act 630 during those negotiations, BMS similarly had to request, and was granted, several extensions of the company's deadline to submit application materials required under the law. *See* Email from Senior Assistant Attorney General Jordan Broyles to Kevin King (July 1, 2026), *attached as* **Exhibit B** to King Decl.; Email from Senior Assistant Attorney General Jordan Broyles to MaKade Claypool (July 27, 2026), *attached as* **Exhibit C** to King Decl. Indeed, precisely because of the Board's continued enforcement policy, BMS expended considerable resources evaluating how it would begin to comply with the Act. *See* McCarthy Decl. ¶ 48.

On July 28, 2026, the Board held a scheduled public meeting to consider limited distribution network applications under the Act. Rather than acting on those applications, however, the Board adopted two resolutions. *See generally* Arkansas State Board of Pharmacy, *PharmBd July 28th 2026 Informal Conference Review - PM*, YouTube.com (July 28, 2026) ("July Board Vote"), https://tinyurl.com/4enc44rh, *hand-filed under separate cover* as **Exhibit H** to King Decl.

The first resolution granted the Arkansas Attorney General authority to settle pending and threatened litigation on a specific set of terms approved by the Board ("Settlement Terms"). *See id.* at 36:18–40:22; *see also* Board Resolution Regarding Act 630 Settlement Authority (adopted July 28, 2026), *attached as* **Exhibit D** to King Decl. The Settlement Terms require the settling

company to dismiss pending challenges to Act 630 without prejudice and forgo further related litigation. *See* King Decl. Ex. D § 1. In exchange, the Board would agree not to enforce Act 630 against the settling company. *See id.* But the duration of that nonenforcement pledge is undefined, and the Settlement Terms address a scenario in which the Board nonetheless "attempts to enforce Act 630 against the [settling] entity." *Id.* § 2. In that situation, the Settlement Terms provide that the company may "file [a] new lawsuit … challenging Act 630." *Id.*

The Board then adopted a second resolution more broadly declining to enforce Act 630 ("Nonenforcement Policy"). *See* King Decl. Ex. H at 45:58–47:16; *see also* Board Resolution Regarding Act 630 Nonenforcement (July 28, 2026), *attached as* **Exhibit E** to King Decl. Specifically, the Board resolved to "not take any action to enforce Act 630 of 2025 against any entity … that enter[s] into any settlement agreement authorized by the Board" or "that do[es] not enter into any such agreement." King Decl. Ex. E at 1. Under the Board's rules, only a simple majority is necessary to adopt, rescind, or modify these types of resolutions. *See* Ark. Code Ann. § 17-92-204(c).

The Board supported both resolutions with the same justifications. The Board "desire[d] … to abide by the United States Constitution" and thus resolved to suspend enforcement "in light of" the Court's decision in *Novartis* "that Act 630 is likely unconstitutional." King Decl. Ex. D at 1; King Decl. Ex. E at 1 (same). The Board adopted this justification on advice of counsel from the Attorney General's office, which similarly expressed the view that the Act is "likely" unconstitutional in light of *Novartis*. *See* King Decl. Ex. H at 22:52–23:07. Additionally, the Board adopted these resolutions to "conserve resources and avoid unnecessary litigation." King Decl. Ex. D at 1; King Decl. Ex. E at 1.

A few days after the July Board Vote, the Board's Executive Director issued a memorandum alerting interested parties to the Board's resolutions and explaining that due to the Nonenforcement Policy, "the Board decided that there was no further consideration or action to be taken on any submitted applications *at this time*." John Clay Kirtley, *Memorandum re: Board Action on Act 630 of 2025* (July 31, 2026), *attached as* **Exhibit F** to King Decl. (emphasis added).

Defendants then moved to dismiss BMS's complaint on two grounds. *See* ECF 28 ("Board Brief") at 15–19. Defendants first argue that the Board's "intervening actions eliminate[d] any live controversy" and thus have mooted this action. *Id.* at 15–16. Separately, Defendants argue that the Nonenforcement Policy deprives BMS of a cause of action under *Ex parte Young*, 209 U.S. 123 (1908), and that sovereign immunity therefore bars this suit. Board Brief at 18–19.[2]

**ARGUMENT**

BMS is entitled to judgment as a matter of law. *First*, contrary to Defendants' assertion, this matter is not moot under the voluntary cessation doctrine. *Second*, for similar reasons, the Board's Nonenforcement Policy does not deprive BMS of a viable *Ex parte Young* cause of action. *Third*, because there are no threshold issues preventing consideration of the merits, and because Defendants have publicly acquiesced in the Court's *Novartis* order, the Court should grant BMS summary judgment.

[2] Defendants also opposed BMS's motion for a preliminary injunction. *See* Board Brief at 19–27. But because BMS withdrew its preliminary injunction motion on August 7, 2026, that opposition is no longer relevant to the Court's analysis. *See* ECF 30; *see also* ECF 32 (recognizing the withdrawal of, and administratively terminating, the preliminary injunction motion).

## I. The Court Should Deny Defendants' Motion to Dismiss.

### A. This Case Is Not Moot.

Defendants do not dispute that BMS had standing, and that the case was not moot, when BMS filed this suit on June 23, 2026. Nor could they dispute that point, given the Board's active enforcement of the Act at the time.

Instead, Defendants base their motion on the Board's subsequent adoption of the Nonenforcement Policy. That argument fails several times over. Although a case "becomes moot … when it is impossible for a court to grant any effectual relief whatever to the prevailing party," *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (citation omitted), Defendants' unilateral action can be rescinded or modified at any time, and therefore does not satisfy that demanding test. As the Supreme Court observed in *Gomez*, a case is not moot where, as here, "the parties" continue to "have a concrete interest, however small, in the outcome of the litigation." *Id.*

"It is well-settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). This doctrine exists to prevent "a defendant [from] engag[ing] in unlawful conduct, stop[ping] when sued to have the case declared moot, then pick[ing] up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Thus, a defendant cannot "automatically moot a case … simpl[y] [by] suspending its challenged conduct after it is sued" *unless* it can meet its "formidable burden" of "prov[ing] no reasonable expectation remains that it will return to its old ways." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up); *see also Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000) (defendant bears heavy burden of showing that "the challenged conduct *cannot* reasonably be expected to start up again" (emphasis added; citation

omitted)); *see also McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1037 (8th Cir. 2004) (describing voluntary cessation burden as "stringent").

Defendants have not carried their burden here. After the Court's *Novartis* decision, the Board continued to enforce the Act against BMS and other manufacturers. *See supra* p.6. It continued to insist that drug manufacturers submit the applications required by the Act, *see* King Decl. Ex. G at 1:34:00–2:50:00, and its Executive Director publicly stated that the Board had a nondiscretionary legal obligation to enforce the Act against all parties other than Novartis, *see id.* at 1:38:44–1:39:22 ("But the problem is … we have a state law that says we have to take timely action on this. … *[W]e have no choice* but to follow what [Act 630] instructs us to do, which is why we're here today." (emphasis added)). After BMS (and others) sued to challenge the constitutionality of Act 630, the Board maintained that course, including by imposing "deadlines" for applications to establish compliance with the Act's requirements. *See* King Decl. Ex. A. Defendants twice agreed to extend these deadlines as to BMS, including as recently as July 27, 2026, *see* King Decl. Ex. B—a step that presupposed an obligation for BMS to comply with the Act's requirements.

After taking those steps, the Board announced that it no longer intends to enforce the Act based on a "desire" to "avoid unnecessary litigation." King Decl. Ex. D at 1; *see* King Decl. Ex. C at 1. And now, because of that unilateral action, Defendants claim that this litigation is moot. *See* Board Brief at 15–17. The voluntary cessation doctrine thus applies, placing on Defendants the "formidable burden" of showing *no* reasonable expectation that the Board will renew enforcement of Act 630. *Fikre*, 601 U.S. at 241 (cleaned up).[3] Defendants cannot satisfy that test.

---

[3] Despite these undisputed facts, Defendants assert that the voluntary cessation doctrine does not apply because the Board "never enforced Act 630 against BMS," and thus it could not have

(cont.)

*First*, Defendants claim that the Nonenforcement Policy "is a settled course, not a temporary pause." Board Brief at 17. But this Policy can be abandoned or modified just as easily as it was adopted. Nothing prevents the Board from reversing course and "reinstat[ing]" its earlier enforcement policy "at any time," *Lankford*, 451 F.3d at 503, "immediately or later at some more propitious moment," such as when there is a change in the Board's membership or significant political pressure for enforcement, *see Fikre*, 601 U.S. at 243. In precisely these circumstances—*i.e.*, where nothing prevents a defendant from readopting its challenged policy—courts have regularly declined to dismiss on mootness grounds. *See, e.g.*, *id.* at 242–43 (removing plaintiff from the No Fly List did not "spea[k] to whether the government might relist him … in the future"); *Aladdin's Castle*, 455 U.S. at 289 ("In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated."); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (voluntary abandonment of a discriminatory policy did "not moot this case" where the state did not make "absolutely clear that it could not revert to its policy of excluding religious organizations" (citation omitted)); *Felts v. Green*, 91 F.4th 938, 941 (8th Cir. 2024) ("The City does not identify subsequent events that make it *absolutely clear* that Felts *could not* reasonably be blocked again for tweets critical of the President of the Board[.]" (emphases added)). Indeed, the Board's assertion, through its Executive Director, that the Board has a state-law duty to continue enforcing the Act in the absence of a contrary court ruling, *see* King Decl. Ex. G at

"stop[ped] when sued" nor could future enforcement be characterized as a "recurr[ence]." Board Brief at 16–17 (citation omitted). But as discussed, that myopic understanding of "enforcement" misstates the record and ignores the Board's actions implementing Act 630 prior to and during this litigation, *see* King Decl. Ex. G at 1:34:00–2:50:00, including its extensions of BMS's application deadlines, *see* King Decl. Ex. B.

1:38:44–1:39:22, substantially undermines Defendants' characterization of the Nonenforcement Policy as a durable, settled policy.

The ease with which the Board can reverse course also distinguishes this case from others where a defendant's voluntary cessation mooted the controversy. Unlike in *Nike*, the Nonenforcement Policy is not an "irrevocable" binding covenant that limits the Board's actions in the future; the Board can change its mind at any time. 568 U.S. at 93; *see also id.* (Nike's covenant "me[t] the burden imposed by the voluntary cessation test" because it would "prohibi[t]" the company "from filing suit" and "making any claim or any demand" (emphasis omitted)). Unlike in *Teague v. Cooper*, the Arkansas legislature has not "repeal[ed]" the underlying law with "no evidence" of potential "reenact[ment]," 720 F.3d 973, 978 (8th Cir. 2013); on the contrary, Act 630 remains on the books and is scheduled to take effect on September 1, 2026. And there is no court order or statutory provision limiting the Board's ability to change course; it can renew enforcement with a simple majority vote. *See, e.g.*, *LaBatte v. Gangle*, 161 F.4th 1109, 1117 (8th Cir. 2025) (expired statute of limitations made the impossibility of future prosecution "absolutely clear"); *Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 811 (8th Cir. 2007) (obligation to comply with a court order created "no reasonable expectation" of recurrence); *Hillesheim v. Holiday Stationstores, Inc.*, 903 F.3d 786, 791 (8th Cir. 2018) (defendant unlikely to "change … back" significant structural renovations to a parking lot "once this litigation is over" after spending "considerable time and money" to make those changes).

*Second*, it is immaterial that the Board, unlike the defendants in *Mullin v. Al Otro Lado*, 146 S. Ct. 2079, 2090 n.7 (2026), did not expressly "reserv[e]" the right to engage in "future enforcement." *See* Board Brief at 17. Although the *Al Otro Lado* defendants admitted that they "would likely" "reimpose" the allegedly unconstitutional policy, *see* 146 S. Ct. at 2090 n.7, that

distinction does not move the needle in Defendants' favor. No case—including *Al Otro Lado*—limits the voluntary cessation doctrine to only those cases when a defendant expressly reserves the right to resume the challenged action.

If anything, this case is more like *Al Otro Lado* than Defendants let on: The Board has, at least implicitly, recognized the possibility that it will resume enforcing the Act. The Settlement Terms, for example, expressly address a scenario in which "the Board attempts to enforce Act 630." King Decl. Ex. D § 2. After presupposing the possibility of future enforcement, Defendants cannot now claim to this Court that no possibility of recurrence exists. Finally, the Board issued a memorandum just days after the July Board Vote informing interested parties that the Board had decided to take no further action "*at this time*." King Decl. Ex. F at 1 (emphasis added). That tentative language falls well short of establishing that "the challenged conduct *cannot* reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. at 189.

Although the Board has announced that it does not plan to enforce the Act, that policy does not bind the Board today, tomorrow, or at any point in the future. The policy is effective only as long as the Board wants it to be. Such a flimsy promise does not satisfy the Board's "formidable burden" of demonstrating *no* reasonable possibility of renewed enforcement in the future. *Fikre*, 601 U.S. at 241 (cleaned up).

**B. Sovereign Immunity Does Not Bar This Suit.**

Defendants also argue that an *Ex parte Young* cause of action is viable only if there is a threat of an ongoing legal violation and that one no longer exists in light of the Board's Nonenforcement Policy. *See* Board Brief at 18; *see Ex parte Young*, 209 U.S. at 156. But this is just a second attempt to argue mootness, and it fails for the same reasons as above.

"The *Ex parte Young* doctrine rests on the premise 'that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for

sovereign-immunity purposes.'" *Elder v. Gillespie*, 54 F.4th 1055, 1062 (8th Cir. 2022) (quoting *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1131 (8th Cir. 2019)). Thus, to determine whether a plaintiff has a cause of action under *Ex parte Young*, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 949 (8th Cir. 2023) (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002)).

Here, there is no dispute that, when this action was filed, both requirements were satisfied. BMS is seeking prospective relief (declaratory and permanent injunctive relief). There was undoubtedly an "ongoing violation of federal law" because Act 630 was in effect when BMS sued. And at that point the Board had repeatedly stated that covered entities were required to comply with the Act's requirements. On June 16, 2026, the Board publicly announced that it would continue to enforce the Act against all manufacturers other than Novartis. *See generally* King Decl. Ex. G at 1:34:00–2:50:00. The Board then approved multiple applications at that June meeting, *see id.*, and it also set a July 15, 2026 deadline for any further applications, *see* King Decl. Ex. A.

The Board continued to enforce Act 630 even after BMS filed its complaint. For example, on July 27, 2026, the Board executed an agreement extending the deadline for BMS to "file applications" under the Act until August 31, 2026, and providing that "the Board will not take enforcement action against BMS with respect to [the] Act *if* any required applications are filed by" that date. *See* King Decl. Ex. C at 1 (emphasis added).[4] The promise to forgo enforcement "if"—

[4] The Board executed a similar agreement with BMS on July 1, 2026. *See* King Decl. Ex. B.

but only if—BMS timely filed its Act 630 applications, together with the Board's other actions, shows that the Act remained in full force and effect.

Just as the Board's subsequently adopted Nonenforcement Policy does not moot this action, it also does not deprive BMS of a viable *Ex parte Young* cause of action. "It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)). Thus, "after vesting," a court's jurisdiction "cannot be ousted by subsequent events," *Mollan*, 22 U.S. at 539, unless, of course, the case is moot, *see Friends of the Earth*, 528 U.S. at 189. But for the reasons discussed above, the case is not moot because Defendants cannot satisfy the stringent requirements of the voluntary cessation doctrine. *See Fikre*, 601 U.S. at 241. Accordingly, the Court should reject Defendants' belated attempt to contest BMS's cause of action.

To allow Defendants to escape the possibility of prospective injunctive relief in these circumstances "would work an end-run around the voluntary cessation exception." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013); *accord Riley's Am. Heritage Farms v. Elsasser*, No. 23-55516, 2024 WL 1756101, at *2 (9th Cir. Apr. 24, 2024). Courts have refused to allow state actors to end-run live disputes by voluntarily stopping conduct in the face of litigation and then claiming immunity. *See, e.g.*, *R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1225 (9th Cir. 2023) (applying *Ex parte Young* where the plaintiff remained subject to an "indefinite" exclusion and "uncertain" reinstatement, making the alleged violation and requested relief prospective in nature). The Board's resolution to "not take any action" does not repeal Act 630, which remains on the books. Nor does the Board's action provide permanent relief from the consequences that flow from noncompliance with Act 630's requirements. The current Board's resolution does not

eliminate those obligations, and, as discussed above, the Board could reverse course at any point. Simply put, the Board lacks authority to nullify Act 630, and a unilateral resolution adopted under the pressure of litigation does not repeal the statute. *See Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) ("The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." (citing *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338–41 (11th Cir. 1999))).

*Riley's* illustrates the point. There, the Ninth Circuit reversed a grant of summary judgment where a school district, after losing an earlier appeal, adopted a resolution disclaiming any policy barring the plaintiff from its programs. *See* 2024 WL 1756101, at *1. The court held that "changing course in the midst of litigation—even if the party is a state actor"—does not eliminate a live dispute. *Id.* at *2. The court recognized that "[e]ven in cases involving defendants with Eleventh Amendment immunity," harms may remain "'ongoing' even after a defendant's voluntary cessation of the unlawful conduct or policy." *Id.* The court thus "decline[d] to let state actors end-run live disputes by voluntarily stopping conduct in the face of litigation and then claiming immunity." *Id.* The present case is a "live dispute" in the same way because Act 630 remains in force and imposes compliance obligations on BMS—backed by stiff statutory penalties—that take effect on September 1, 2026. *See* Act 630 § 3.

*K.P.* is likewise on point. The plaintiffs there brought an action challenging the constitutionality of a state law that excluded certain claims from coverage under the state's medical malpractice fund. *See* 729 F.3d at 431–32. After the suit was filed, the defendants (who administered the malpractice fund) agreed to convene a medical review panel to assess the plaintiffs' pending claims, but expressly reserved the right to deny fund coverage for claims they

deemed outside the scope of the statutory protections. *Id.* at 434. The defendants later argued that completion of the panel's review process ended any ongoing violation, stripping the plaintiffs of a claim under *Ex parte Young*. *Id.* at 438–39. The Fifth Circuit rejected that position for both mootness and *Ex parte Young* purposes, holding that the defendants' post-suit course correction did not eliminate the ongoing violation. *Id.* at 439. Like the Ninth Circuit in *Riley's*, the Fifth Circuit recognized that treating such a post-suit course correction as eliminating the "ongoing" violation required by *Ex parte Young* "would work an end-run around the voluntary cessation exception to mootness where a state actor is involved." *Id.* The court of appeals therefore held that the Eleventh Amendment did not bar the providers' *Ex parte Young* claim.

*Minnesota Chapter of Associated Builders & Contractors v. Ellison*, 153 F.4th 695 (8th Cir. 2025), is not to the contrary.

*First*, *Ellison* primarily addressed a different prong of the *Ex parte Young* analysis—*i.e.*, whether the attorney general had "some connection with enforcement." *Id.* at 699; *see also 281 Care Committee v. Arneson*, 638 F.3d 621 (8th Cir. 2011) ("*Care Committee I*") (allowing *Ex parte Young* suit to proceed because the defendant had a sufficient connection to enforcement). That prong is not at issue here, as Defendants do not dispute that they possess authority to enforce Act 630. Moreover, *Ellison* applied *Ex parte Young*'s enforcement prong to evaluate *standing*, holding that the defendants' lack of enforcement authority meant that the plaintiff "lack[ed] standing to sue, divesting the district court of subject matter jurisdiction." 153 F.4th at 702. Yet here, there is no dispute that BMS had standing when it filed the suit, and the case has not become moot for the reasons discussed above. Indeed, merely a "credible threat of prosecution" is sufficient to establish pre-enforcement standing and a cause of action under *Ex parte Young*. *Care Committee I*, 638 F.3d at 627, 632.

*Second*, *Ellison*'s facts distinguish it from this case. There, the attorney general possessed discretionary authority; no statute required him to enforce the challenged law. 153 F.4th at 701–02. Here, by contrast, Act 630 imposes mandatory statutory duties that cannot be repealed by the Board's post-litigation Nonenforcement Policy, and the Board's Executive Director has publicly stated that the Board "ha[s] no choice but to follow what [Act 630] instructs us to do." King Decl. Ex. G at 1:38:44–1:39:22.[5]

*281 Care Committee v. Arneson*, 766 F.3d 774 (8th Cir. 2014) ("*Care Committee II*"), is similarly inapposite. There, the attorney general secured dismissal of a lawsuit against her based on an affidavit testifying that her office had never prosecuted violations of the underlying statute, would decline any request to prosecute the plaintiffs' activities, and had no intention of ever filing an administrative complaint concerning such violations.[6] *Id.* at 796–97. And substantively, the affidavit merely confirmed her office's *preexisting* record of nonenforcement—*i.e.*, that it had *never* initiated, nor ever intended to initiate, a prosecution under the relevant statute. *See id.* at

[5] Additionally, portions of Act 630 could be read to impose consequences without the Board's direct involvement. *See* Ark. Code Ann. § 20-64-105(e) (directing a "state government and public plan sponsor for a health benefit plan" "not [to] pay for prescription drugs from a pharmaceutical manufacturer or a pharmaceutical manufacturer for Medicaid who is noncompliant with this section" unless the Board separately "grant[s] a temporary waiver or temporary allowance").

Moreover, the Attorney General has recently alleged that BMS's limited distribution networks violate the Arkansas Deceptive Trade Practices Act. *See* Complaint, *Arkansas v. AbbVie, Inc.*, No. 57-cv-26-184, ECF 1 (Ark. Cir. Ct. Jul. 21, 2026); *see also* Ark. Code Ann. § 23-92-601 (2021). Given those allegations, BMS faces a credible threat that the Board will resume enforcement of Act 630's requirements for limited distribution networks.

[6] Although the affidavit the attorney general relied upon was generated after the litigation commenced, it merely confirmed that the attorney general never had an intention to enforce the relevant statute—both before and after the suit was commenced. *See Care Committee II*, 766 F.3d at 796–97 (the affidavit confirmed that "the attorney general's office never has filed, and has no intention of ever filing, a complaint … alleging a violation of" the relevant statute). In fact, the motion to dismiss, filed earlier in the litigation, likewise noted that the plaintiffs had failed to point to any past prosecutions or threatened future prosecutions by her office under the relevant law. *See* Mem. of Law In Support of Mot. to Dismiss of Def. Lori Swanson at 6, *281 Care Committee v. Arneson*, No. 8-cv-2514, ECF 48 (D. Minn. Apr. 14, 2009).

796. Against *that* backdrop, *Care Committee II* held that an *Ex parte Young* cause of action did not lie because the attorney general's office had "neither enforced nor threatened to enforce the statute challenged as unconstitutional." *Id.* at 797 (citation omitted).

Here, by contrast, the Nonenforcement Policy comes on the heels of the Board's insistence that it was required to enforce Act 630, its actions considering applications and setting submission deadlines, and its initial repudiation of the Court's conclusions in *Novartis*. *See supra* p.6. This about-face thus looks nothing like the deputy attorney general's affidavit in *Care Committee II*, which merely confirmed a consistent history of past nonenforcement.

In sum, Defendants' voluntary cessation fails to preclude an *Ex parte Young* theory just as it fails to moot this case. The Board's revocable, post-litigation reversal thus poses no obstacle to the Court's resolution of the merits of BMS's claims.

## II. The Court Should Enter Summary Judgment for BMS.

If the Court denies Defendants' Motion to Dismiss, it should enter summary judgment for BMS. There are no disputed material facts underlying BMS's claims. *See* Rule 56 Statement of Undisputed Material Facts (filed concurrently with this paper). And the case presents an unusually straightforward pathway for resolution of the merits: the Court has already concluded that Act 630 is likely unconstitutional, *see Novartis*, 2026 WL 1382468, at *27; Defendants have not appealed that decision; and the Board has publicly acquiesced in the *Novartis* order, stating that nonenforcement of the Act is warranted to "abide by the United States Constitution." King Decl. Ex. C at 1; King Decl. Ex. D at 1. All that remains is for the Court to enter final judgment in BMS's favor.

### A. Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute

of fact exists where a rational jury could decide the particular question of fact for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "To be material, the disputed facts must be facts which, under the substantive law governing the issue, might affect the outcome of the suit." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). To survive summary judgment, the nonmoving party "must demonstrate the existence of specific facts" supported by sufficient probative evidence that would permit a favorable finding "on more than mere speculation, conjecture, or fantasy." *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017).

**B. Act 630 Violates Dormant Commerce Clause Principles.**

The Constitution gives Congress authority to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3. With this power comes "a further, negative command," *National Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (citation omitted), that "prohibits state laws that unduly restrict interstate commerce," *Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025) ("*AAM*") (citation omitted). State laws violate this "dormant Commerce Clause" principle by (1) "clearly discriminating against interstate commerce in favor of in-state commerce," (2) "imposing a burden on interstate commerce that outweighs any benefits received," or (3) "having the practical effect of extraterritorial control on interstate commerce." *Id.* (cleaned up).

In *Novartis*, this Court concluded that the Act likely commits the first type of violation by "[o]vert[ly] discriminat[ing] against interstate commerce." *Novartis*, 2026 WL 1382468, at *22–26. BMS agrees, and the Court need go no further to resolve this motion. But BMS further contends that Act 630 commits the other two types of violations: It burdens interstate commerce without countervailing benefits, confirming the law's discriminatory purpose; and it directly regulates wholly out-of-state transactions.

### 1. Act 630 Is Facially Discriminatory.

On its face, Act 630 discriminates in favor of in-state pharmacies. As this Court held, the law "giv[es] pharmacies … distinct advantages" based on geographic location, and it does so "to the detriment of out-of-state entities." 2026 WL 1382468, at *24–25. Act 630 also suffers from a "discriminatory purpose." *Id.* at *21 n.223.

"[S]eek[ing] to advantage in-state firms" over their "out-of-state rivals" is quintessential protectionism. *Pork Producers*, 598 U.S. at 370. For these reasons, states cannot lawfully "insulate in-state [businesses] from out-of-state competition" and "ro[b] out-of-state" business of their "natural competitive advantage … over in-state" businesses. *Id.* at 372–73, 378 (citations omitted).

The Act, however, "plainly does just that." *Novartis*, 2026 WL 1382468, at *22. Arkansas pharmacies receive a clear statutory right of "special access to limited distribution networks." *Id.* at *22–23; *see also* Ark. Code Ann. § 20-64-105(c)(1)(B) (manufacturer must "allo[w] for … request or application" and give "similar access" to in-state pharmacies), (d)(2)(B) (manufacturer "shall allow some pharmacies in this state, upon request or application, to participate and access" the network). By contrast, out-of-state competitors who want to access BMS's limited networks do not enjoy that benefit—they have no "statutorily-required opportunities for application or consideration," nor are they given the "statutorily-required access that some in-state entities will get." *Novartis*, 2026 WL 1382468, at *22–23. This scheme tilts the scales towards in-state pharmacies "based on physical location" with no purpose other than to "giv[e] preferential treatment," *id.* at *24, insulating them from competition across state lines for the same opportunities to "suppl[y] specialty prescription drugs[] to the same patient population[s]." *Id.* at *24–25; *see also Pork Producers*, 598 U.S. at 378.

The Act's practical effects are also discriminatory because they provide in-state benefits *at the expense* of existing limited network participants. Dormant Commerce Clause principles prohibit laws whose "practical effect[s] … insidiously operat[e] to the advantage of local" firms while "downgrading" or "depriv[ing]" out-of-state businesses "of the market premium that [their products] would otherwise command." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 350–52 (1977). Act 630 violates that principle because it will "shift … sales out of the hands of out-of-state pharmacies and into the hands of pharmacies with physical locations in Arkansas." *Novartis*, 2026 WL 1382468, at *25. Limited distribution networks are, by definition, limited. And those restrictions create inherent exclusivity for the in-network dispensers. *See* McCarthy Decl. ¶¶ 30, 36, 42. By forcing BMS to open those networks to in-state pharmacies, "Act 630 will likely have the effect of either (1) reducing the drug transactions that already-admitted pharmacies currently have from their exclusive agreement with [BMS] or (2) crowding these out-of-state pharmacies out altogether." *Novartis*, 2026 WL 1382468, at *26.

Indeed, many of BMS's affected drugs have very small patient populations in Arkansas, exacerbating the disadvantage to BMS and its network partners. For example, in 2025, only 98 Arkansans were prescribed CAMZYOS®, a drug whose distribution network does not include in-state specialty pharmacies. *See* McCarthy Decl. ¶¶ 30–31. Yet by forcing BMS to add Arkansas pharmacies to that network, Act 630 "will" cause existing out-of-state dispensers to "lose some (if not all) of those patients" as sales "shift … out of the hands of out-of-state pharmacies and into the hands of pharmacies with physical locations in Arkansas." *Novartis*, 2026 WL 1382468, at *25. This shift "would not necessarily increase patient access, but it would redistribute that fixed product volume across a larger set of pharmacies." McCarthy Decl. ¶ 60.

Act 630 also suffers from a facially discriminatory purpose. Laws with "discriminatory intent" violate the Commerce Clause; courts rely on "direct and indirect evidence to determine whether a state adopted a statute with a discriminatory purpose," including the "evidence in the form of 'statements by lawmakers.'" *Jones v. Gale*, 470 F.3d 1261, 1269 (8th Cir. 2006) (citations omitted). In *Jones*, for example, the "text" and "title" of a ballot initiative "reveal[ed]" its "manifest purpose … to differentiate, or discriminate, between family farm corporations located in Nebraska as opposed to those located elsewhere." *Id.* Similarly, supporters publicly touted the initiative as a means to "send a message to those rich out-of-state corporations." *Id.* at 1270. This evidence made "clear beyond cavil that" the initiative "bristle[d] with an animus against out-of-state corporations." *Id.*

Here, there is also ample evidence—from Act 630 itself and surrounding history—that Arkansas enacted the law with a discriminatory purpose. The Act's title shows that it aims to "prohibit" BMS from relying solely on "out-of-state pharmacies" to dispense certain drugs. *See supra* n.1. The Act's findings similarly brand "out-of-state limited distribution" networks made up of "mail order pharmacies" and "[p]ublicly traded corporation pharmacies" as potentially harmful to patients *because* such networks do not give "access" to "local pharmacies, clinics, and hospitals." Ark. Code Ann. § 20-64-105(a)(2). As discussed above, other provisions show that the Act exists to give in-state dispensers preferential treatment over their non-Arkansas counterparts that rely on mail orders. *See, e.g.*, *id.* § 20-64-105(d)(2)(B) (granting "pharmacies in this state" access to limited distribution networks so long as they can provide "same day access in this state without requiring patients to use out-of-state … common mail carriers for access"). As one of the bill's sponsors summed it up, the Act seeks to "put Arkansas care … in the hands of real

Arkansans."[7] Such overt "animus" toward non-Arkansan entities, *Jones*, 470 F.3d at 1270, establishes that Act 630 suffers from "an unconstitutional purpose," *Novartis*, 2026 WL 1382468, at *21 n.223; *see also id.* at *10 n.139.

Because Act 630 is discriminatory on its face, it is "subject to strict scrutiny." *Entergy Arkansas, LLC v. Webb*, 122 F.4th 705, 711 (8th Cir. 2024). Thus, the Act is "*per se* invalid" unless Defendants show that there are "no other means to advance a legitimate local interest." *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003) (citation omitted). This Court has already held that the Act likely fails this "rigorous scrutiny." *Novartis*, 2026 WL 1382468, at *26–28. Defendants have not shown anything more than "de minimis" interests in "the purported local benefits of [patient] accessibility, safety, and freedom of choice." *Id.* at *26. They have also offered *no* "evidence of any specific patients who were denied prompt access to a life-saving treatment because a drug had to come out of state," or evidence "of a patient who was harmed after taking their specialty medication incorrectly because they received it from a mail-order pharmacy rather than a local pharmacy." *Id.*[8]

**2. Act 630 Unduly Burdens Interstate Commerce.**

Beyond discriminating against BMS's out-of-state pharmacy partners, Act 630 fails the balancing test set out in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). This test "requires balancing a legitimate local public interest against its incidental burden on interstate commerce." *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1030 (8th Cir. 2020) (citation omitted).

[7] Testimony of Rep. Achor Before the H. Ins. & Com. Comm., at 9:04–9:13 (Mar. 19, 2025), https://perma.cc/JPK3-RP2D, *hand-filed under separate cover* as **Exhibit I** to King Decl.

[8] Even if the State's interests were valid, "these benefits can be achieved by other readily-available, nondiscriminatory, and otherwise lawful alternatives." *Novartis*, 2026 WL 1382468, at *27. Because Arkansas took none of those paths, Act 630 is "not … likely to pass rigorous scrutiny" under Dormant Commerce Clause principles. *Id.*

"A law fails this balancing analysis when 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike*, 397 U.S. at 142). Act 630 flunks this test because it creates significant burdens on interstate commerce with few, if any, benefits.

Start with the Act's significant burdens on interstate commerce. Its primary effect will be to force BMS to re-tool distribution networks to grant Arkansas pharmacies special access. *See* Ark. Code Ann. § 20-64-105(d)(2)(B). This process will introduce significant complexities into BMS's networks. Adjusting the network for BMS's IMiD products would require sizeable approval, licensing, and data monitoring efforts for each additional pharmacy so that BMS can efficiently manage its limited inventory and timely ship its products. And contracting with a new dispensing pharmacy would take six months or longer. *See* McCarthy Decl. ¶ 55. By forcing BMS to shift its networks away from their "efficien[t]" and nationwide operations so that drug dispensing is "performed in the home State," Act 630's burdens should be "viewed with particular suspicion," since such burdens "ha[ve] been declared to be virtually *per se* illegal." *R&M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 736 (8th Cir. 2002) (citation omitted).

Beyond the Act's adverse effects on BMS, the Court must also consider the law's "cumulative effects," including the burden that would arise "if several jurisdictions were to adopt similar [statutes]." *Id.* (citation omitted). If other states followed Arkansas's lead, the burden on drug manufacturers, distributors, and dispensers would be even more problematic. *See id.* Manufacturers would need a dispenser in every jurisdiction, creating obvious oversight and management concerns. "[S]uch a situation" would almost certainly "create a substantial burden on interstate commerce." *R&M Oil*, 307 F.3d at 736.

The Act's purported benefits do not justify these significant burdens. As noted above, "the purported local benefits of [patient] accessibility, safety, and freedom of choice … go no further than generalizations." *Novartis*, 2026 WL 1382468, at *26. Indeed, the Act's penalty for noncompliance—limiting Arkansas patients' access to the manufacturer's drugs—further belies the notion that its benefits are anything but "illusory." *Id.* Even if the State's interests were adequately supported, their overall weight falls short because the State could "promot[e]" them "with a lesser impact on interstate activities." *R&M Oil*, 307 F.3d at 735 (citation omitted); *see also Novartis*, 2026 WL 1382468, at *27.

**3. Act 630 Directly Regulates Out-of-State Transactions.**

Act 630 also violates the Dormant Commerce Clause's extraterritoriality principles by regulating out-of-state transactions. Following *Pork Producers*, the Eighth Circuit reaffirmed that a state "has no power to project its legislation into another state" and "directly regulat[e] transactions which take place wholly outside the State." *AAM*, 140 F.4th at 960–61 (cleaned up); *see also Pork Producers*, 598 U.S. at 376 n.1 (same). For this type of Dormant Commerce Clause claim, a plaintiff need not show "discrimination." *AAM*, 140 F.4th at 961 (cleaned up; quoting *Pork Producers*, 598 U.S. at 376 n.1).

Act 630 transgresses this constitutional guardrail. To comply with the law, BMS would need to rework its out-of-state distributor agreements and shift limited volumes away from existing specialty pharmacies. None of these participants in BMS's limited networks is located in Arkansas. *See* McCarthy Decl. ¶¶ 52–56. Thus, for BMS's IMiD products, the Act will directly affect BMS's transactions with existing out-of-state network dispensers despite there being no connection to Arkansas. *See* McCarthy Decl. ¶ 36.

Although these out-of-state distributor agreements may have downstream effects in Arkansas—by, *e.g.*, affecting how drugs are dispensed in Arkansas—that limited connection does

not justify regulating the other transactions that will take place "wholly outside the State." *Pork Producers*, 598 U.S. at 376 n.1 (citation omitted); *see also AAM*, 140 F.4th at 959 (Minnesota law was impermissibly extraterritorial where it "regulate[d] the price … out-of-state manufacturers sell their drugs to wholesalers" despite those transactions "impact[ing] prices downstream" and resulting in "drugs … eventually end[ing] up in Minnesota").

### C. Federal Law Preempts Act 630.

This Court has already suggested that Act 630 likely "will (at least partially) be preempted by federal law." *Novartis*, 2026 WL 1382468, at *21 n.223. Again, BMS agrees: The Act cannot be squared either with the Federal Food, Drug, and Cosmetic Act ("FDCA") or Medicaid provisions of the Social Security Act.

#### 1. Act 630 Is Preempted by the FDCA.

The FDCA preempts Act 630 in two ways. Specifically, Act 630 (a) renders compliance with state and federal law impossible and (b) obstructs the FDCA's purposes and objectives.

When it is "impossible to comply with both the federal and state requirements," the federal law preempts state law. *Forest Park II v. Hadley*, 336 F.3d 724, 732–33 (8th Cir. 2003); *see also Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1093 (2026). That is the case here.

The FDCA requires the U.S. Food and Drug Administration ("FDA") to determine whether a drug is safe and effective for its proposed uses before approving the product for sale in the United States. *See* 21 U.S.C. §§ 331(d), 355(a), (d).[9] When an otherwise "benefi[cial]" and "effective" new drug poses inherent safety risks that threaten to outweigh its benefits, FDA has authority to condition approval on the manufacturer's compliance with a specific "risk evaluation and

[9] A similar review process governs approval of biological products. 42 U.S.C. § 262(a). In this brief, the term "drug" includes drugs approved under 21 U.S.C. § 355(a) and (j) and biological products approved under 42 U.S.C. § 262(a) and (k).

mitigation strategy," or "REMS." *See id.* §§ 355(p)(1), 355-1(a). These strategies can include many different approaches to mitigate risks, including labeling requirements, educational materials, and packaging or disposal protocols. *Id.* § 355-1(e). All REMS also require manufacturers to gather and report certain data on their drugs.[10] These requirements often restrict the pharmacies to which manufacturers can distribute their drugs. *See id.* § 355-1(f)(3)(B).

Compliance is also mandatory, with REMS obligations falling on the manufacturer's shoulders. *Id.* §§ 333(f)(4), 355(p)(1). In the event of noncompliance, FDA could bring an enforcement action against the manufacturer or even revoke approval to sell the noncompliant drug in the United States. *See id.* §§ 351(y), 331(a), 333; 21 C.F.R. § 314.150(b)(3).

REMS compliance thus turns on whether a dispensing pharmacy has the systems, training, and personnel necessary to execute program-specific requirements each time a prescription is filled. *See* McCarthy Decl. ¶ 18. BMS, for example, relies on limited distribution networks not only when a REMS expressly limits distribution to certified pharmacies, but also when REMS requirements necessitate partnering with specialty dispensers that have the resources necessary to, for example, handle and administer drugs safely and effectively; to counsel and proactively help patients adhere to their treatment plans; and to engage in regular monitoring, data collection, and reporting. *See* McCarthy Decl. ¶¶ 12–15.

But as this Court explained in *Novartis*, Act 630 requires BMS to allow local pharmacies to "access [a] limited distribution network even [if the pharmacies] do not meet the applicable REMS" requirements. 2026 WL 1382468, at *17; *see also id.* at *19 (explaining that Ark. Code Ann. § 20-64-105(d)(2)(B) mandates pharmacy "access" without imposing any obligation that the

---

[10] *See* FDA, *REMS Assessment: Planning & Reporting Guidance for Industry* 7-10 (2019), https://www.fda.gov/media/119790/download.

applicant "meet the REMS requirements"). Those REMS requirements are substantial, and in some cases demand specialized systems, trained personnel, and operational controls that are not typically present in a retail pharmacy. McCarthy Decl. ¶ 29. Accordingly, Act 630 is preempted because it imposes "a state-law duty" that is inconsistent with BMS's "federal law duty" to comply with FDA-imposed safety standards. *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

Act 630 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Forest Park II*, 336 F.3d at 733 (citation omitted). Congress empowered FDA to impose REMS for a specific purpose: to facilitate the safe distribution of drugs. In other words, the "purposes and objectives of Congress" of the relevant FDCA provisions are to ensure that needed medicines can safely be distributed under the oversight and control of FDA. *Forest Park II*, 336 F.3d at 733 (citation omitted).

But Act 630 obstructs those objectives. Under Act 630, BMS must take special measures to alter the distribution networks it has designed to comply with federal REMS requirements, and in some cases the company must admit Arkansas pharmacies to its networks even when the pharmacies lack the certifications, experience, or facilities necessary to properly implement REMS programs. *See* Ark. Code Ann. § 20-64-105(c)–(d); McCarthy Decl. ¶ 54. Act 630 further obstructs Congress's intent to create a uniform national REMS system with FDA as the sole decisionmaker. Congress vested FDA with exclusive authority over the approval, conditioning, and oversight of drug distribution. FDA alone decides whether a drug may enter interstate commerce, 21 U.S.C. §§ 355(a), (c), (d), and whether to condition that approval on REMS adherence, *id.* §§ 355(p)(1), 355-1(f)(1)(A). Congress also instructed FDA to "consul[t]" with and "seek input from" other stakeholders, *id.* §§ 355-1(c)(2), (f)(5)(A), but left the "final

determination" to the agency, *id.* § 355-1(f)(1). Thus, Congress's "manifest purpose" was to create a "comprehensive regulatory framework for safe use and distribution of higher-risk drugs *run by the FDA*." *Bryant v. Stein*, 732 F. Supp. 3d 485, 505 (M.D.N.C. 2024) (emphasis added).

Act 630 interferes with this uniform regulatory scheme. It empowers the Board to determine whether a manufacturer's distribution model is adequate—a determination that, for REMS-subject drugs, involves considering compliance with REMS requirements. *See, e.g.*, Ark. Code Ann. § 20-64-105(c)(1)(B)(iv) (limited network must have "at least" a "pharmacy meeting medication specific [FDA] guidance or requirements"). But Congress assigned that determination to FDA, not to a state pharmacy board. The mere "potential for conflict" arising from multiple entities asserting power to answer the same question "militates in favor of finding preemption." *Vonage Holdings Corp. v. Nebraska Pub. Serv. Comm'n*, 564 F.3d 900, 905–06 (8th Cir. 2009).

**2. Act 630 Is Preempted by Medicaid Provisions of the Social Security Act.**

Act 630 similarly conflicts with federal laws that govern the scope of coverage for state Medicaid programs and the process for making coverage determinations.

Medicaid is a joint federal-state health insurance program for low-income individuals. Federal law requires the Secretary of Health and Human Services to approve each state's Medicaid plan, 42 U.S.C. § 1396a(b), and that plan must "comply with the applicable requirements" of the Medicaid drug rebate program statute (42 U.S.C. § 1396r-8), including those related to payment and reimbursement, *see id.* § 1396a(a)(54). Under these statutes, a state may exclude a particular drug from coverage *only* in certain narrow circumstances, including if the drug's "prescribed use is not for a medically accepted indication" or if the coverage restrictions are part of an agreement between the state and the manufacturer. *Id.* § 1396r-8(d)(1)–(2), (4)(C).

Act 630 conflicts with these statutes. It creates an additional ground on which Arkansas can exclude all of a manufacturer's drugs from the state's Medicaid program—*i.e.*, failing to

include in-state pharmacies in a drug's limited distribution network, *see* Ark. Code Ann. § 20-64-105(b)(3), (e)—that is *not* a ground enumerated in the Medicaid statute. *See* 42 U.S.C. § 1396r-8(d)(1)–(2). Arkansas's state Medicaid plan does not include noncompliance with Act 630 as a ground for refusing coverage, nor has the Secretary of Health and Human Services approved that limitation. Act 630 thus conflicts with the State's "oblig[ations] … to comply" with federal Medicaid restrictions, *Lankford*, 451 F.3d at 510; *accord Harris v. McRae*, 448 U.S. 297, 301 (1980)—a "direc[t] conflict" that renders Act 630 preempted, *see Lankford*, 451 F.3d at 509–13.

Separately, Act 630 conflicts with Medicaid laws that limit who can make adjustments to the Arkansas Medicaid program, including coverage exclusions. Federal law allows each state to designate only a "single State agency" to administer its Medicaid plan. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1). Once that designation is made, the state's Medicaid agency "[can]not delegate … the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters" to any other agency or official. *Id.* § 431.10(e). In Arkansas, only the Division of Medical Services of the Department of Human Services has been designated as the agency responsible for overseeing the state's Medicaid program.[11]

Act 630, however, gives the Board a piece of this power, allowing it to determine whether a manufacturer has complied with the Act and thus whether its drug portfolio qualifies for coverage. *See* Ark. Code Ann. § 20-64-105(e). Moreover, the Act expressly grants the Board further Medicaid-related authority by allowing it to grant a "temporary waiver or temporary allowance" that permits an otherwise noncompliant manufacturer to continue participating in the Arkansas Medicaid program. Under federal law, only the Division of Medical Services may

[11] *See* Arkansas Department of Human Services, Division of Medical Services, https://perma.cc/A8X6-PW43.

exercise those powers. This conflict with federal Medicaid statutes and regulations further renders Act 630 preempted. *See Lankford*, 451 F.3d at 509–13.

**D. Act 630 Is Void for Vagueness.**

The Act is unconstitutional for an additional alternative reason: several of the terms that guide the Board's application of the law to particular circumstances are unconstitutionally vague. When a statute "fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement," it violates due process and must be voided. *United States v. Deng*, 104 F.4th 1052, 1054 (8th Cir. 2024). While courts apply a "less strict vagueness test" to "economic regulation" that concerns "businesses," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982), a statute fails even that test when it is so opaque that it specifies "no standard of conduct … at all," *Minn. Chapter of Assoc. Builders & Contractors, Inc. v. Blissenbach*, 155 F.4th 1015, 1021 (8th Cir. 2025) (quoting *Hoffman Estates*, 455 U.S. at 495 n.7).

Act 630's core (and unconstitutional) requirements are sufficiently clear—manufacturers must include local pharmacies in their limited distribution networks, and the operation of those networks will conflict with federal law. But beyond those undisputed requirements, numerous individual factors and criteria that govern how the Board will apply the law are "grammatically and syntactically incoherent." *Novartis*, 2026 WL 1382468, at *9 n.137.

Consider the specific criteria that a network must satisfy to comply with section 1(c)(1)(B) of the Act. Under that provision, the network must "allo[w] … [a] local network of public institution academic medical center access" and provide "[g]eographic diversity of access within the state." These ambiguous terms are undefined, providing covered entities with no guidance as to how they may comply with their statutory obligations. *See* Ark. Code Ann. § 20-64-105(c)(1)(B). Section 1(d)—which generally requires Board approval for limited distribution

networks designed to operate for longer than six months—is equally unclear. It identifies a host of undefined factors the Board "may" consider when making permit decisions including, *e.g.*, "Costs," "Logistics," "Patient caseload," "rarity," and "[a]ny other factors unique or relevant to the medication and disease or condition treated." Ark. Code Ann. § 20-64-105(d)(2)(A). And if the Board grants approval, section 1(d) states that the manufacturer must "allow *some* pharmacies in this state … to participate" in the network. *Id.* § 20-64-105(d)(2)(B) (emphasis added). The Act, again, never defines "some," a term so vague it could mean at least two pharmacies or two dozen—the latter of which could potentially fill up an entire limited distribution network.

These standardless provisions expose BMS to significant risks of arbitrary enforcement. *See Deng*, 104 F.4th at 1054. They are therefore unconstitutionally vague.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss and enter summary judgment for BMS, declare Act 630 unconstitutional, and permanently enjoin Defendants from enforcing Act 630 against BMS.

Respectfully submitted,

John E. Tull III, Ark. Bar No. 84150
R. Ryan Younger, Ark. Bar No. 2008209
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
jtull@qgtlaw.com
ryounger@qgtlaw.com

Kevin F. King*
Kuntal V. Cholera*
MaKade C. Claypool*
Noah C. Zimmermann*
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
kking@cov.com
kcholera@cov.com
mclaypool@cov.com
nzimmermann@cov.com

*Counsel for Plaintiff*
*Bristol Myers Squibb Company*

August 24, 2026

**Admitted pro hac vice*